**Moses I. RICHMAN, Plaintiff,**

v.

**Maurice STAHL and Sydney Jacoby,
Defendants.**

United States District Court
S. D. New York.
April 30, 1963.

Alvin Miller, New York City, for plaintiff.

Sugarman, Kuttner & Fuss, New York City, for defendants; Eugene L. Sugarman, New York City, of counsel.

McLEAN, District Judge.

This is an action for damages for alleged intentional misrepresentations in the sale of the stock of a real estate cor-

poration. Jurisdiction is based on diversity of citizenship. The real estate was located in Massachusetts, the contract of purchase was made there, and the closing took place there. The parties agree that Massachusetts law applies.

There is no serious dispute between the parties as to what actually occurred in the course of their negotiations. The parties differ radically, however, as to the inferences and conclusions to be drawn from the evidence. I find the facts to be as follows:

Columbia Gardens, Inc., a Massachusetts corporation, owns five small apartment houses in South Boston, Massachusetts. Defendants, who between them owned all the stock of the corporation, decided early in 1959 to sell their stock. They prepared a memorandum, described as a "setup," setting forth the location and description of the property, the income therefrom in the amount of $129,660, and "estimated expenses" totalling $100,172, including fuel $8,800, fire insurance $1,527, liability insurance $955. The memorandum deducted the total estimated expenses from the income and set forth a "profit" of $29,448 per year.

In April 1959 defendants sent this memorandum to a real estate broker in Boston, Marcus Schon. Schon sent it to plaintiff, a man experienced in real estate transactions in the Boston area.

Plaintiff subsequently made an offer to purchase the stock of Columbia Gardens, Inc. His first offer was rejected, but after further negotiations carried on through Schon, the parties finally agreed on a price of $205,000. A contract of purchase and sale was signed by the parties in Boston on May 29, 1959. Plaintiff paid to defendants $10,000 as a deposit on the purchase price.

The date for the closing was originally set for July 31, 1959. Prior to that date, at plaintiff's request, the closing was adjourned to August 31, 1959. Plaintiff paid to defendants another $10,000 deposit in order to secure their consent to the adjournment.

During the summer plaintiff visited the property and looked at the heating equipment, among other things. Using a rule of thumb method, he estimated that the cost of heating the buildings would be $20 per room, or a total of $8,500 for the 445 rooms in the apartments, a figure substantially the same as that set forth in defendants' "estimate."

Early in August plaintiff's lawyer wrote to defendants' lawyer and requested a balance sheet and operating statement of Columbia Gardens, Inc. for the year ending May 31, 1959. Defendants' lawyer forwarded such a statement to plaintiff's attorney on August 17. The statement showed an actual cost of fuel for the year ended May 31, 1959 of $14,931.75. The statement set forth a total item for "taxes and insurance," but did not break down this figure into separate items for the various types of insurance.

No further communications between the parties took place between August 17, 1959 and the date of the closing, August 31. On that day the parties and their attorneys met in Boston. Early in the conference the broker Schon spoke privately to the defendants and informed them that he had been told that plaintiff believed that defendants had misrepresented the cost of fuel in their original memorandum or "setup," that plaintiff had been advised by his lawyer that he could complete the purchase and then proceed to sue defendants for fraud, and that he, the broker, was worried as to what would happen. Defendants said that they were not disturbed about it. The broker said that he felt some allowance should be made to the plaintiff in order to induce him to complete the transaction without further controversy. Defendants said that they were not prepared to offer any concessions on the price and that if any allowance were to be made, it would have to come out of the broker's commission of $15,000. The broker said that he realized that he might not be entitled to a commission if the deal did not go through, and that in order to avoid such a consequence, he was willing to give up $5,000 of his commission.

Schon and defendants then returned to the conference. Defendants said that they had learned that plaintiff was dissatisfied with the figures on fuel consumption. Plaintiff said that he was. Defendants then explained that the fuel consumption in the previous year had been abnormally high, due to the fact that the furnaces did not shut off properly and operated all night as well as all day. To correct that situation, defendants had procured Minneapolis-Honeywell Company to install automatic controls, so that the furnaces would shut off during the night hours. Minneapolis-Honeywell had advised defendants that these controls would reduce fuel consumption by at least one-third.

Defendants called their building superintendent, Dukeshar, into the conference. He confirmed what defendants had said about the new controls and the savings which they were expected to produce. Plaintiff, however, indicated that he was not convinced.

During the course of the all-day meeting, plaintiff had discovered that the broker had expressed a willingness to reduce his commission by $5,000. Plaintiff privately asked Schon whether it would be "out of order if you gave me the $5,000 that you offered to them" [i. e. to defendants]. Schon said that he did not care what form the transaction took as long as everyone was apprised of the facts.

Finally matters came to a head. Defendants asked plaintiff how much of an allowance on the purchase price he wanted because of the discrepancy in fuel costs. Plaintiff said he wanted $40,000. Defendant said that this was out of the question and that in fact they were not willing to make any allowance out of their own pocket, but that the broker would be willing to give up $5,000 of his commission. Plaintiff indicated his dissatisfaction with this proposal, but defendants refused to change it. Finally, after a brief silence, plaintiff said, "Pass papers." He made no other comment.

The parties then proceeded to close the transaction. Schon delivered to plaintiff a written assignment of his claim against defendants for commissions in the amount of $15,000. Defendants gave plaintiff a credit of $15,000 on the purchase price. Plaintiff paid Schon $10,000 for the assignment. He endorsed the assignment as follows:

"Received payment of above by way of adjustment. August 31, 1959.

"Moses I. Richman."

After the $15,000 credit and after various other adjustments pro and con for deposits and other items not material here, the amount to be paid by plaintiff was computed to be $166,624.52. Plaintiff delivered to defendants a check for that amount.

Nothing was said at any time during the conference with respect to any discrepancy in insurance expenses.

Some two weeks after the closing, on September 15, 1959, plaintiff's lawyer wrote to defendants' lawyer stating that plaintiff demanded an allowance on the purchase price because of the inaccuracies in the statement furnished to him by defendants with respect to cost of fuel oil and fire insurance. This letter said nothing about liability insurance. Defendants' attorney replied on September 18 expressing his surprise at this demand and refusing to entertain it. Thereafter this action was begun.

As previously stated, the actual cost of fuel for the properties for the year ended May 31, 1959 was $14,931.75. The actual cost of fire insurance for that year was $1,859.59 and liability insurance was $1,914.81.

According to the books of Columbia Gardens, Inc., which I accept as correct, the actual cost of the disputed items for the calendar year 1960 was as follows:

| | |
|---|---|
| Fuel | $9,244.80 |
| Fire Insurance | 1,859.59 |
| Liability Insurance | 893.43 |

There was testimony that plaintiff made certain repairs to the heating system after he acquired possession which might have somewhat reduced the cost of

the fuel. It is undisputed that plaintiff reduced the amount of coverage on the liability insurance, with consequent reduction in premium. He did not change the amount of coverage on the fire insurance.

According to the books, the income actually received in the year 1960 was $130,738.65, as contrasted with the figure in defendants' estimate of $129,660.

Defendants' explanation of why they set forth in their estimate $8,800 as the cost of fuel, instead of the actual cost of $14,931.75 in the fiscal year 1958–59, was primarily that they relied upon the expected savings to be enjoyed as a result of the installation of the Minneapolis-Honeywell controls. There is some suggestion that they also based their estimate upon the rule of thumb method of $20 per room, as indicated by material furnished them by the Bronx Borough Taxpayers, a real estate organization, and by the Federal Housing Administration. They explained their estimate for fire insurance of $1,527 as contrasted with an actual cost in 1958–59 of $1,859.-59 on the theory that they had carried insurance in excess of the amount required by the Federal Housing Administration, which had guaranteed a mortgage on the property, and that a prospective purchaser would probably reduce the amount. They had a similar explanation for their estimate of the cost of liability insurance of $955 as contrasted with an actual cost in 1958–59 of $1,914.81.

These facts give rise to certain questions of law which, upon analysis, may be broken down as follows:

1. Were defendants' representations actionable?

2. Is recovery prevented by the fact that plaintiff proceeded to close the transaction and took title to the stock after he had learned of the discrepancy between the fuel figure in defendants' memorandum and the actual fuel cost for the preceding fiscal year?

3. Did plaintiff agree to compromise and settle whatever claims for deceit he might otherwise have had?

As to the first question, the basic ingredients of an action of deceit in Massachusetts were summarized in Alpine v. Friend Bros., Inc., 244 Mass. 164, 138 N.E. 553 at 554 (1923) as follows:

"To recover in an action of deceit the plaintiff must prove as to the misrepresentation that it was as to a matter of fact, which may include a belief or an intention, made by the defendant or his agent; that it was made with the intention to induce another to act upon it; that it was made with knowledge of its untruth or was made of a fact susceptible of actual knowledge with recklessness as to its truth or falsehood, * * * that it was intended that it should be acted upon, as it was, and that damage directly resulted therefrom."

As far as *scienter* is concerned, other Massachusetts cases state the rule more favorably to a plaintiff in that they do not appear to require any "recklessness" on the part of a defendant as to the truth of a fact which should be within his knowledge. Thus, in Pietrazak v. McDermott, 341 Mass. 107, 167 N.E.2d 166 at 168 (1960), the court said:

"If a statement of fact which is susceptible of actual knowledge is made as of one's own knowledge and is false, it may be the basis for an action of deceit without proof of an actual intent to deceive." See also Weeks v. Currier, 172 Mass. 53, 51 N.E. 416 (1898).

Mere expressions of opinion are not actionable. Loughery v. Central Trust Company, 258 Mass. 172, 154 N.E. 583 (1927); Coe v. Ware, 271 Mass. 570, 171 N.E. 732 (1930).

But a person's state of mind, i. e., his belief, is a fact, not an opinion. See Alpine v. Friend Bros., Inc., supra; Pietrazak v. McDermott, supra.

How do these generalities apply here? If defendants had stated that the fuel expense for the preceding fiscal year was $8,800, this would obviously have been an untrue representation of a fact which was, or should have been, within defend-

ants' knowledge, and hence it would have provided a solid foundation for an action for deceit. But defendants did not so state, literally, at any rate. Nor do I believe that defendants' memorandum would convey any such implication to an experienced real estate operator. When a man states that the "estimated expenses" of a piece of property are such and such, he is saying that he believes in good faith that these are the expenses which a prospective buyer will encounter. Such an "estimate" looks to the present and to the immediate future, not to the past. This is not to say that such a statement is purely an expression of opinion as to a future occurrence of which the author has no knowledge or over which he has no control. It is not comparable, for example, to the statement of a retail automobile dealer that the manufacturer will not at some future time reduce the price of the particular make of car (Coe v. Ware, supra). It is a representation as to the author's present state of mind, i. e., his present belief, and in that sense it is a representation of an existing fact. If these defendants had no cause to believe that the cost of fuel and fire and liability insurance for 1959–60 would not be different from what they had been in 1958–59, then they made an actionable misrepresentation.

The evidence establishes, and I so find, that the furnace controls were installed toward the end of the fiscal year 1958–59 and that defendants were advised that fuel bills would thereby be reduced by at least one-third. Defendants therefore had good reason to believe that the fuel cost for 1959–60 would not exceed $10,-000. The figure which they put in their estimate was $8,800. In fact, according to the corporation's books, the cost proved to be somewhere in between, i. e., $9,244.80.

The estimated insurance items, which seem to be something of an afterthought on plaintiff's part, inasmuch as they were not mentioned at the closing, were admittedly less than their actual cost in 1958–59. But defendants' belief that the amount of liability insurance was exces-

sive and that it could be reduced, thereby substantially reducing the premium, turned out to be justified. Plaintiff later did reduce it and the premium for 1960 actually was somewhat less than defendants' estimate. Since plaintiff did not reduce the fire insurance, although, for all that appears, he might have done so without imprudence, defendants' estimate of that premium proved to be incorrect by some $330.

■ These differences seem trivial in a transaction of this magnitude. They are in large measure offset by the fact that defendants' estimate of the income of the property was, as events turned out, about $1,000 too low. All in all, the evidence is not strong enough to justify a finding that defendants were guilty of intentional misrepresentation and deceit. I conclude that plaintiff has not sustained his burden of proof on this point.

I do not rest the decision of this case solely on this conclusion, however, as there is another basis for the result. I proceed, therefore, to consider the other two questions of law mentioned at the outset of this discussion.

■■ The fact that plaintiff took title despite his knowledge of the actual facts, does not, in itself, constitute a waiver of his right to recovery. The Massachusetts law is clear that where a contract of purchase has been partially executed before the aggrieved party discovers the fraud, he may, if he chooses, complete the purchase and subsequently sue for damages. Geoffrion v. Lucier, 336 Mass. 532, 146 N.E.2d 654 (1957).

Here the contract had been partially executed by plaintiff's payment of the two deposits of $10,000 each before plaintiff received the profit and loss statement of the corporation which alerted him to the situation. I find that before he received that statement in August 1959, plaintiff had no knowledge of any possible inaccuracies in defendants' memorandum.

It remains to consider whether, at the closing, plaintiff compromised and settled his claim. If he did, Massachusetts

law prevents recovery, both on the theory of waiver and of accord and satisfaction. See Powers v. Rittenberg, 270 Mass. 221, 169 N.E. 913 (1930).

At the closing defendants offered to compromise by granting an allowance of $5,000 which was to be provided, not by them but by the broker. Plaintiff accepted the $5,000 "by way of adjustment." He testified that he did not thereby intend to settle, that he had merely asked the broker for a gift of $5,000, that he knew that he was not "entitled to it," and that "in all truth, I thought Schon was foolish to give it to me."

■ This testimony does not commend itself to me as an accurate portrayal of plaintiff's true state of mind. Moreover, even if plaintiff in fact did have a mental reservation as to the significance of the assignment of the commission, he clearly did not communicate that reservation to defendants. When defendants offered the $5,000 in settlement, and plaintiff, after first rejecting it, finally said, "Pass papers," and thereupon proceeded to close the purchase and to pay defendants a price $15,000 less than he would have had to pay but for the assignment, defendants were entitled to believe that plaintiff intended to accept the $5,000 in settlement of his claim. That was the plain meaning of his words and actions. A party is bound to what a reasonable man would understand his words to mean, even though he may privately intend them to mean something else. As Judge Learned Hand said in Hotchkiss v. National City Bank of New York, 200 F. 287 at 293 (S.D.N.Y.1911):

> "A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort."

This has been the rule in Massachusetts for many years. Mansfield v. Hodgdon, 147 Mass. 304, 17 N.E. 544 (1888).

■ I find as a fact that the parties agreed at the closing on August 31, 1959 upon a compromise and settlement of plaintiff's claim for $5,000, which amount plaintiff thereupon received by way of allowance on the purchase price, and that plaintiff thereby waived his claim. I conclude that this settlement is a bar to plaintiff's recovery.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Defendants' motion to dismiss made at the close of the entire case is granted. The Clerk is directed to enter judgment for defendants.

So ordered.