Juan E. Mendoza, demandante y recurrente, *v.* Cervecería Corona, Inc., demandada y recurrida.

Número: R-67-94     Resuelto: 27 de junio de 1969

*José H. Picó,* abogado del recurrente; *Carlos A. Chavier Stevenson,* abogado de la recurrida.

El Juez Asociado Señor Dávila emitió la opinión del Tribunal.

El demandante compró para su negocio ambulante, dedicado a la venta de refrescos, dulces y algunos comestibles, dos cajas de "Malta Corona" en un almacén de Puerta de Tierra. La compra se realizó a eso de las 2:30 de la tarde. Tres horas después destapó una de las botellas que previamente había puesto a enfriar y comenzó a ingerir su contenido. Cuando estaba terminando sintió una borra babosa de mal sabor, de la cual había residuos en el fondo de dicha botella. Se los enseñó a una persona que allí estaba. El demandante sufrió una intoxicación estomacal, con las con-

siguientes náuseas, vómitos, diarreas y malestar general. Estuvo hospitalizado por espacio de dos días en la Clínica Seín, durante los cuales se le lavó el estómago, se le puso suero y le administraron antiácido y antiespasmódicos.

La demanda radicada para resarcirse contra la Cervecería Corona, Inc., fabricante de la "Malta Corona" fue desestimada. El tribunal determinó que la doctrina de garantía implícita no era aplicable y que el demandante no probó que la demandada incurriera en negligencia. Acordamos revisar.

En *Castro* v. *Payco, Inc.*, 75 D.P.R. 63 (1953) resolvimos que el fabricante de productos alimenticios le responde en daños a una persona, que a consecuencia de haber ingerido tal producto, sufre una intoxicación. El demandante en aquel caso había comprado un mantecado de coco directamente a un empleado de la compañía demandada. Ante esos hechos, dijimos a la luz de la Ley Núm. 72 de 26 de abril de 1940, conocida como "Ley de Alimentos, Drogas y Cosméticos de Puerto Rico", a las págs. 72 y 73:

". . . En su consecuencia, cuando el fabricante de un artículo alimenticio lo pone a la venta para el consumo humano, la presunción es que ha dado cumplimiento a la ley, que ha puesto en el mercado un artículo no adulterado y que garantiza que es apropiado para el fin a que el producto se destina.

En la mayoría de los Estados de la Unión se sigue en casos de esa índole la regla de garantía implícita (*implied warranty*) o sea la de que la persona que sirve o vende un producto alimenticio para el consumo humano garantiza de manera tácita que el producto es sano y apropiado para ser consumido por el hombre . . . . Esta doctrina es de aplicación en Puerto Rico según los preceptos de la antes mencionada Ley 72 de 1940."

En el caso de *Castro* v. *Payco*, el propio fabricante vendía el producto. En el de autos no existe relación contractual alguna entre el demandante y la corporación demandada. (¹)

---

(¹) La Corte de Apelaciones de los Estados Unidos para el Primer Circuito en *Coca-Cola Bottling Co. of Puerto Rico* v. *Negrón Torres*,

¿Debemos extender la norma establecida a casos en que no exista relación contractual? ¿Debe el fabricante meramente garantizar que el producto es sano o debe imponérsele una responsabilidad absoluta para garantizarlo?

De el año 1266 datan los primeros estatutos criminales ingleses, imponiendo penalidades a cerveceros, carniceros y reposteros por poner en el mercado alimentos adulterados o contaminados. Para el año 1431 ya varios tratadistas señalaban una serie de *dicta* en varios casos sosteniendo la responsabilidad absoluta de los vendedores de alimentos a base de una garantía implícita. Véase Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L.J. 1099, 1104 (1960).

Más tarde, en 1847 en el caso de *Burby* v. *Bollett*, 16 M. & W. 644, 153 Eng. Rep. 1348, se indicó en un *dictum* la responsabilidad civil absoluta de los vendedores de alimentos a los consumidores o compradores. Decisiones posteriores hacían referencia a un tipo especial de responsabilidad, que luego se identificó y caminó a la par con la garantía, que imponía una responsabilidad absoluta a los manufactureros o fabricantes de alimentos en favor del consumidor, bajo un principio de política pública: la preservación de la salud y de la vida humana. Pero esta doctrina tenía la limi-

---

255 F.28d 149 (1958) interpretó el caso de *Castro* v. *Payco*, como que establecía responsabilidad sin necesidad de que mediara nexo contractual de clase alguna. Se expresó así:

"No podemos, por supuesto, estar seguros de que el Tribunal Supremo de Puerto Rico compartiría nuestra opinión y encontraría meritoria la excepción a la regla general que requiere relación contractual entre comprador y vendedor en acciones por violación de garantía implícita de aptitud para el uso planeado, cuando están envueltos artículos para consumo humano vendidos en envases sellados. Sin embargo nos sentimos justificados en creer que la sólida base teórica para la excepción, y su mérito intrínseco, llevaría al Tribunal Supremo de Puerto Rico a reconocer la excepción y resolver cuando surja la ocasión que, en cuanto a la salubridad de alimentos, la garantía implícita de aptitud para consumo humano no se basa tanto en contrato como en la fuerte política pública, según claramente expresada en la ley local de alimentos y drogas, de preservar la salud humana y hasta la vida misma . . . ."

tación de que sólo brindaba protección a aquellos que compraban directamente del fabricante. Se originó en la errónea interpretación que se le dio al viejo caso inglés de *Winterbottom* v. *Wright*, 10 M. & W. 109, 152 Eng. Rep. 402 (Ex. 1842).(²) A ese efecto expresa Prosser, en su obra *Law of Torts* (3ra. ed. 1964) a la pág. 658:

"La decisión solamente resolvió que no se podía fundar acción alguna basada en el contrato solamente, pero ciertas expresiones ·de varios jueces, particularmente las palabras de Lord Afinger, quien predijo 'las más absurdas y atroces consecuencias para las cuales yo no veo límites', 'a menos que limitemos el efecto de tales contratos a las partes que en ellos intervinieron', fueron interpretadas como que no se podía instar una acción ni siquiera de naturaleza extracontractual, y esto era cierto para cualquier incumplimiento de contrato, incluyendo la venta de un coche defectuoso . . . . El error en esta interpretación del caso ha sido expuesto desde entonces; pero de ella se desarrolló una regla general que ha prevalecido hasta el siglo veinte de que no existía responsabilidad de una parte contratante para con uno que no estuviera en relación contractual."

Las cortes americanas para superar el rigor de la regla que se sostenía había sido sentada en el caso de *Winterbottom* desarrollaron excepciones a la misma.(³)

---

(²) Pronto se convirtió en la regla general de este campo basado en una norma de política pública: proteger al manufacturero incipiente de una responsabilidad universal para con personas desconocidas, en una época en que comenzaban a introducirse en el proceso económico en desarrollo y luchaban por sobrevivir. Véanse, Hill, *Liability of Manufacturer in Absence of Negligence*—1965, ABA Sec. of Ins. N.C.L. 224 (1965); Phelps, *Extent of Manufacturer's Duty of Care to Persons Other Than the Inmediate Purchaser*, 2 John Marshall L.Q. 387 (1937).

(³) Ver Prosser, *op. cit.* a las págs. 659–660 donde expresa:

"Las cortes comenzaron a desarrollar varias excepciones las cuales echaron a un lado la regla general derivada del supuesto *dictum* de *Winterbottom* v. *Wright*. La primera fue la de que si el vendedor conocía que el bien mueble era peligroso para el uso que se le intentaba dar y dejaba de revelar este hecho al comprador, se hacía responsable por los daños causados por tal uso a una tercera persona, bajo el fundamento de 'algo así como fraude' en el encubrimiento intencional. Una segunda

Amparándose en una de estas excepciones a principios de la segunda década de este siglo, las cortes respondiendo al clamor de una ciudadanía indignada por los abusos cometidos por los fabricantes y elaboradores de productos alimenticios comenzaron a imponer a estos fabricantes y elaboradores una responsabilidad absoluta para con los consumidores. *Mazetti* v. *Armour Co.*, 135 Pac. 633 (Wash. 1913); *Parks* v. *C. C. Yost Pie Co.*, 144 Pac. 202 (Kan. 1914); *Jackson Coca Cola Bottling Co.* v. *Chapman*, 64 So. 791 (Miss. 1914). Ver Prosser, *op. cit.* a la pág. 674.

Hasta el año 1916 era la norma en la mayoría de las jurisdicciones americanas que a menos que se pudiese aplicar alguna de las excepciones reconocidas a que alude Prosser, no existía responsabilidad sin una previa relación contractual. *Haset* v. *J. I. Case Threshing Mach. Co.*, 120 Fed. 865 (8th Cir. 1903); *Catlin* v. *Union Oil Co.*, 161 Pac. 29 (Cal. 1916); *Cliff* v. *California Spray Chem. Co.*, 257 Pac. 99 (Cal. 1927).

En el año 1916 el Juez Cardozo emite su famoso dictamen en *MacPherson* v. *Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050, 1053. Arremetió contra la doctrina de la previa relación contractual, resolviendo que "el manufacturero de este artículo de peligro está bajo el deber de fabricarlo con cuidado, irrespectivamente del contrato."

Durante los años subsiguientes esta decisión fue generalmente aceptada en casi todas las jurisdicciones americanas. Noel, *Retailers and Manufacturers*, 32 Tenn. L. Rev. 207,

---

excepción imponía responsabilidad cuando el bien mueble era suministrado para ser usado en el recinto del demandado, considerando al comprador como un invitado. La tercera, y más importante excepción, sostenía que el vendedor era responsable a una tercera persona por la preparación o venta de un artículo inminente o inherentemente peligroso a la seguridad humana. Por más de medio siglo esta excepción permaneció imperfecta y vagamente definida. Incluía obviamente drogas, alimentos y bebidas, armas de fuego y explosivos, pero existía una disputa, sin mucho sentido sobre como deben ser clasificados tales productos como jabón, tabaco de mascar, o el envase de una bebida."

226 (1965). Los casos posteriores a *MacPherson*, supra, fueron extendiendo la norma para que cubriese a empleados del comprador, a su familia, a compradores posteriores, hasta a un peatón que sea impactado debido a un defecto de fábrica en los frenos de un carro. Véase Prosser, *op. cit.* a la pág. 663 y casos allí citados y *The Assault Upon the Citidel (Strict Liability to the Consumer)*, supra.

Con posterioridad al caso de *MacPherson* se comienzan a elaborar un sinnúmero de teorías[4] para responsabilizar al fabricante, obviando la inexistencia de un contrato entre éste y el consumidor demandante. Una de estas excepciones y la que más aceptación tuvo es la de la "garantía implícita". En 1927 la Corte Suprema de Mississippi elaboró esta excepción en el caso de *Coca-Cola Bottling Works* v. *Lyons*, 111 So. 305 (1927). Estaba en controversia en ese caso la responsabilidad de la Coca-Cola para con un consumidor que mientras se tomaba una coca cola se tragó unos vidrios que contenía ésta, causándose daños internos. Expresó la Corte en esa ocasión.

"El resarcimiento está basado únicamente bajo la teoría de que la Compañía Coca-Cola era responsable bajo un garantía implícita de que la bebida embotellada era pura y saludable y que el hecho de que había vidrio en la botella cuando fue sellada y puesta en el mercado para el público creó responsabilidad por los daños a aquel que se la tomó, irrespectivamente de la negligencia del manufacturero.

. . . y que el manufacturero garantizó implícitamente la pureza de la bebida a quien del público se convirtió en el poseedor y dueño de la coca-cola. Por lo tanto, si la bebida resultó nociva por razón de tener vidrio en ella, la compañía embotelladora era responsable al consumidor."

Prontamente se convirtió esta excepción en la de mayor aceptación. En la última década ha sido virtualmente la única

---

[4] Cornellius W. Gillam, *Products Liability in a Nut-shell*, 37 Ore. L. Rev. 119, 153–155 (1958) en donde se hace una exhaustiva enumeración de las veintinueve teorías al respecto.

teoría que ha parecido esbozada en las decisiones. Por cerca de treinta años la mayoría de las cortes norteamericanas acuden al concepto y a su vez excepción de la "garantía implícita" para sostener la responsabilidad de los manufactureros frente a los consumidores. *Madorous* v. *Kansas City Coca Cola Bottling Co.*, 90 S.W.2d 445 (Mo. 1936); *Klein* v. *Duchess Sandwich Co.*, 93 P.2d 799 (Cal. 1939); *Nichols* v. *Nold*, 258 P.2d 317 (Kan. 1953); *B. F. Goodrich Co.* v. *Hammond*, 269 F.2d 501 (10th Cir. 1959); *La Hue* v. *Coca Cola Bottling, Inc.*, 314 P.2d 421 (Wash. 1957).

Lo que en un principio se estableció como una posible solución al requisito de la previa relación contractual en su aplicación práctica no tuvo el resultado deseado, debido, como dice Prosser, a su naturaleza híbrida y ambigua. Véase Prosser, *The Assault Upon the Citadel*, supra, a las págs. 1126, 1127, donde se enumeran las dificultades con que se enfrentaron los tribunales al aplicar la doctrina de la garantía implícita. Y la realidad era que al aplicar el concepto de garantía implícita, lo que en verdad se establecía era una norma de responsabilidad absoluta, ya que la doctrina de la garantía implícita impone a los fabricantes y vendedores el deber de proveer un producto adecuado para el uso para el cual se fabrica y vende dicho producto, en este caso el consumo humano. De acuerdo a esta doctrina la persona que fabrica, vende, o sirve un producto alimenticio para el consumo humano garantiza de manera tácita que dicho producto es sano y apropiado para ser consumido por el hombre. Prosser, *Strict Liability to the Consumer in California*, 18 Hastings L.J. 9 (1966) a la pág. 16.

Gradualmente se fue aceptando la norma de responsabilidad absoluta en los casos de alimentos, aunque se le denominaba garantía implícita. Se fue extendiendo la norma más allá de alimentos para el consumo humano. Se extendió a casos en que lo que estaba envuelto era alimentos para perros y pescados. *McAfee* v. *Cargill, Inc.*, 221 F.Supp. 5 (S.D.

Cal. 1954); *Midwest Game Co.* v. *M.F.A. Milling Co.*, 320 S.W.2d 547 (Mo. 1959). También se aplicó la norma a casos de *shampoo*, tintes de pelo, detergentes, jabones y cigarrillos respectivamente. (*Graham* v. *Bottenfield's Inc.*, 269 P.2d 413 (1954); *Rogers* v. *Toni Home Permanent Co.*, 147 N.E.2d 612 (Ohio 1958); *Hamon* v. *Dagliani*, 174 A.2d 294 (Conn. 1961); *Kruper* v. *Procter and Gamble Co.*, 113 N.E.2d 605 (Ohio App. 1953); *Pritchard* v. *Liggett and Myers Tobacco Company*, 295 F.2d 292 (1961) (Reh. 350 F.2d 479 (1965)). Véase además Anotación 13 A.L.R.3d 1057 (1967).

En 1960 se resolvió por la Corte Suprema de Nueva Jersey el caso de *Henningsen* v. *Bloomfield Motors, Inc.*, 161 A.2d 69 (1960), que aunque se basa en garantía implícita, rompe la barrera de alimentos o productos de uso personal y responsabiliza a un manufacturero de automóviles por defectos en la varilla del guía de un Plymouth. La varilla al partirse hizo que el auto chocara, causándole daños a la esposa del dueño de éste. Al resolver, el tribunal expresó:

"No vemos una base doctrinal racional para distinguir entre una mosca en una botella de bebida y un automóvil defectuoso. La bebida insalubre puede causar una enfermedad a una persona, el carro defectuoso, con su gran potencialidad de daño al conductor, ocupantes y otros, demanda aún una menor adhesión a la limitada barrera de la relación contractual."

Una vez resuelto *Henningsen*, se generalizó la adopción de la doctrina de responsabilidad absoluta.(⁵) Ello se ha debido en gran parte a que casi todos los estudiosos de esta

---

(⁵) Prosser, en su último artículo *Strict Liability to the Consumer in California*, supra, enumera las jurisdicciones americanas que han adoptado la norma de responsabilidad absoluta, los estados que no lo han adoptado y los que han adoptado la norma por estatuto. A ese efecto expresa:

"Veintidós cortes aceptan actualmente la responsabilidad absoluta en relación a todos los productos: *Arizona* (probablemente), *California, Connecticut, el Distrito de Columbia, Florida, Illinois, Iowa, Kentucky, Michigan, Minnesota, Missouri, New Jersey, New York, North Dakota, Ohio, Oregon, Tennessee, Washington* (aparentemente) [aunque Prosser lo señala como aparente, ya en definitiva se ha adoptado la norma en el caso de

fase del derecho sostienen que debe aplicarse la norma de la responsabilidad absoluta. Al margen se anotan los artículos que tratan sobre esta materia. (⁶)

También el *Restatement of Torts, Second* en su sección 402A (1965) adoptó la teoría de responsabilidad absoluta. Dispone:

---

*Ulmer* v. *Ford Motor Co.*, resuelto por la Corte Suprema de ese estado, el 21 de marzo de 1969, 37 L.W. 2576] *Mississippi, Nevada,* y *Oklahoma,* . . . . [lo hicieron con posterioridad a un artículo anterior de Prosser, *The Fall of Citadel,* 50 Minn. L. Rev. 791]. La última expresión de *Pennsylvania* fue en *Webb* v. *Zern,* 422 Pa. 215, 220 A.2d 853 (1966) . . . .

En tres cortes de jurisdicción federal, prediciendo la norma estatal, han concluido que la responsabilidad será aceptada: *Indiana, Kansas, Vermont.*

Una corte ha insinuado, sin resolverlo, que la aceptará: *Wisconsin.*

En cinco estados se ha adoptado mediante estatuto: *Alabama, Arkansas, Colorado, Virginia, Wyoming.* . . .

En dos estados el desarrollo no se ha extendido más allá de alimentos: *Hawaii, Louisiana.* . . . .

En seis no se ha extendido más allá de alimentos: *Nebraska, Puerto Rico* [se refiere a dos casos resueltos por la Corte de Distrito Federal en Puerto Rico, *Coca-Cola Bottling Co.* v. *Negrón Torres,* 255 F.2d 149 (1st Cir. 1958); *Ponce de León* v. *Coca Cola,* 75 F. Supp. 966;] *Utah* . . . . Existen estatutos de alimentos en *Montana, Carolina del Sur* y *Rhode Island* . . . . Las Cortes Civiles de Apelaciones de Tejas están en desacuerdo, pero la corte suprema aún no ha llegado más allá de alimentos aunque las decisiones federales lo han hecho."

La Corte Suprema de Tejas recientemente en el caso de *Darryl* v. *Ford Motor Co.*, resuelto el 23 de abril de 1969 (37 L.W. 2629) extendió la norma y encontró responsable a un manufacturero de un camión con frenos defectuosos, frente a los pasajeros de un auto que fue impactado por dicho camión. La Corte Suprema de *Alaska* también acaba de adoptar la norma de responsabilidad absoluta en casos de productos al hacer responsable al manufacturero de una camioneta, frente a un comprador que sufrió graves daños en el cerebro debido a un escape de monóxido de carbono. (Véase *Clary* v. *Firth Avenue Chrysler Center, Inc.*, Resuelto el 5 de mayo de 1969 (37 L.W. 2630).)

Además que existen en la actualidad solamente once estados que aún insisten en el requisito de relación contractual o negligencia como base al resarcimiento. Aunque de esos once solamente dos han reiterado esta posición luego del caso de *Henningsen*. Estos estados son Delaware, Georgia, Idaho, Maine, Maryland, Massachusetts, New Hampshire, New Mexico, North Carolina, South Dakota, West Virginia (dictum).

(⁶) Freezer, *Manufacturer's Liability for Injuries Caused by His Products*, 37 Mich. L. Rev. 5 (1938); Note, *Sales Liability of Manufacturer To Remote Vendee for Breach of Warranty*, 29 B.U. L. Rev. 107 (1949);

"Responsabilidad Especial del Vendedor de un Producto por los Daños Físicos al Consumidor o comprador.

(1) Cualquiera que vendiese un producto con una condición defectuosa, irrazonablemente peligrosa al consumidor o comprador o a su propiedad, está sujeto a responsabilidad por daños físicos de tal modo causados al último consumidor o comprador, o a su propiedad, si

(a) el vendedor está envuelto en el negocio de venta de tal producto, y

(b) se espera que llegue y así llega al consumidor o comprador sin ningún cambio sustancial en la condición en que fue vendido.

(2) La regla expresada en la Subsección (1) aplica aunque

(a) el vendedor haya ejercido todo el cuidado posible en la preparación y venta de su producto, y

(b) el consumidor o comprador no haya comprado el producto de/o haya entrado en alguna relación contractual con el vendedor."

En el comentario a esta sección se expone a las págs. 349-50 del *Restatement*:

"Bajo cualquier teoría, la justificación para la responsabilidad absoluta se ha dicho que es que el vendedor, por el hecho

---

Jeanblanc, *Manufacturers' Liability to Persons Other than Their Immediate Vendees*, 24 Pa. L. Rev. 134 (1957); R. Pound, *Problem of the Exploding Bottle*, 40 B.U. L. Rev. 167 (1960); Keeton, *Products Liability—Current Developments*, 40 Texas L. Rev. 193 (1961); *Products Liability Without Fault and the Requirement of a Defect*, 41 Texas L. Rev. 855 (1963); McCurdy, *Warranty Privity in Sales Goods*, 1 Houston L. Rev. 201 (1964); Jaeger, *How Strict Is the Manufacturer's Liability? Recent Developments*, 48 Marq. L. Rev. 293 (1964-65); Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L. J. 5 (1965); Noel, *Strict Liability of Manufacturers*, 50 A.B.A.J. 446 (1964); Steff, *The Exploding Bottle—Why Not Absolute Liability?* 26 U. Pitt. L. Rev. 115 (1964-65); Hensel, *Food, Beverages and Their Containers*, 20 Food Drug Cosm. L.J. 486 (1965); Freedman, *Defect in the Product: The Necessary Basis for Products Liability in Tort and in Warranty*, 33 Tenn. L. Rev. 323 (1966); Emroch, *Testimony and Proof in a Product's Liability Case*, ABA Sec. of Ins. N & CL 172 (1966); Ostarch, *Strict Products Liability—Its Application and Meaning*, 21 Sw. L. J. 629 (1967); Witherspoon, *Torts or Warranties?* XXXIX Miss. L. J. 199 (Marzo 1968); Tratados: 2 Harper & James, *Law of Torts*, Sec. 28.16, págs. 1570-74 (1956); Freedman, *Allergy and Products Liability* (ed. 1961).

de poner en el mercado su producto para el uso y consumo, se ha comprometido y ha asumido una responsabilidad especial en relación a cualquier miembro del público consumidor que pueda resultar damnificado por éste; en el caso de productos necesarios y para los cuales tiene que forzosamente descansar en el vendedor, el público tiene derecho a esperar y así lo hace, que los vendedores de buena reputación se mantendrán detrás de sus bienes; que la política pública exige que el peso de las daños accidentales causados por productos hechos para el consumo recaiga en aquellos que los lanzaron al mercado, y que se le trate como un costo de producción contra el cual se puede obtener una póliza de seguro; y que el consumidor de tales productos tiene derecho a la protección máxima en manos de alguien, y las personas apropiadas a afrontar esto son aquellas que lanzaron los productos al mercado."

En España en varias decisiones del Tribunal Supremo claramente se observa un desarrollo acentuado hacia la responsabilidad objetiva o absoluta. Nada encuentra en el Art. 1902 del Código Civil Español [1802 del nuestro] que lo impida. La Sentencia del 30 de octubre de 1963 haciéndose eco de una corriente jurisprudencial anterior expresó:

". . . si bien nuestra legislación no ha admitido de un modo expreso el sistema de la responsabilidad objetiva, con respecto a los daños sufridos por un tercero, es evidente que tanto la doctrina como la jurisprudencia en una creciente evolución viene inclinándose a reconocer la responsabilidad fundada, en la mera creación de peligros para la comunidad, aún prescindiendo de la culpa del responsable y así la sentencia de 25 de marzo de 1954 . . . declara que cuando las garantías adoptadas conforme a las disposiciones legales para precaver y evitar los daños previsibles y evitables no han ofrecido resultado positivo, revela la insuficiencia de los mismos y que faltaba algo que prevenir, no hallándose completa la diligencia y aplicándose a la responsabilidad extra contractual regulada en los artículos 1902 y siguientes del C. Civ. . . . ." (Aranzadi, *Repertorio de Jurisprudencia*, Tomo XXX, Vol. 2, pág. 423 (1963).)

En la Sentencia de 14 de mayo de 1963 se hace un recuento de sentencias anteriores en que el Tribunal Supremo Español

había determinado responsabilidad bajo los Arts. 1902 y 1905 sin haber mediado ni culpa ni negligencia. Se dice en esta sentencia que trataba de los daños causados por unas instalaciones fabriles defectuosas:

". . . no es cierto que la teoría de la responsabilidad objetiva, haya quedado trasnochada y haya sido abandonada por los juristas, sino que, al contrario, es una aspiración en la evolución del derecho moderno que el hombre responda de todo daño, incluso del no culpable, que sobrevenga a consecuencia de su actuar o de las cosas que le pertenecen o están bajo su guarda, aunque haya procedido con la necesaria previsión y prudencia, hallándose en plena elaboración la delimitación de esos que ya se van abriendo paso en algunos Códigos progresivos—teoría de la responsabilidad sin culpa, del daño objetivo, del riesgo jurídico, o de la causalidad—.

Que en relación a tan delicado problema, es de advertir que esta Sala sin pronunciarse abiertamente por esa teoría de la responsabilidad objetiva, en algunos casos concretos, ha admitido la obligación de indemnizar daños, cuando el autor de ellos no demostró haber actuado con la debida diligencia; así en la S. 19 de octubre 1909, declaró que basta que un animal cause perjuicio a las personas o a las cosas, para que nazca la responsabilidad del dueño, aún no imputándose a éste ninguna clase de culpa o negligencia; b) en la S. de 12 de enero 1928, dijo que la responsabilidad puede surgir 'aunque en la realización de los hechos—dañosos—no haya intervenido culpa ni negligencia del obligado a reparar a otros el daño causado': c) en la sentencia de 10 julio 1945 (Rep. 879), proclamó que aunque el criterio de la responsabilidad objetiva en los atropellos causados por automóviles, no esté consagrada en nuestras leyes, esto no excluye que en ciertos casos puede presumirse la culpa y cargar al autor del atropello la obligación de desvirtuar la presunción; d) en la S. de 2 de marzo 1956 (Rep. 1139), estimó que no puede excusar de responsabilidad al causante de un daño, el haber cumplido formulariamente todos los requisitos reglamentarios a que viene obligado, cuando la realidad se impone demostrando que las medidas adoptadas no dieron resultado; e) en la sentencia de 3 abril 1957 (Rep. 1944), que reiteró la doctrina de que 'basta que un animal cause perjuicios, para que nazca la responsabilidad objetiva de su poseedor, sin

requerirse la existencia de culpa o negligencia de éste'; y f) en la S. de 7 de enero 1960 (Rep. 104), que volvió a declarar que para la exigencia de responsabilidad del art. 1902 'no es necesario, conforme a su texto, la previa licitud'." (Aranzadi, *Op. cit. supra*, Tomo XXX, Vol. 1, pág. 2699 (1963).)

Los tratadistas también así lo han entendido. Véanse Castán, *Derecho Civil Español, Común y Foral*, Tomo 1, Vol. 2 (10ma. ed. 1963) a la pág. 612 y ss; Scaevola, *Código Civil*, Tomo XXXI (1961) a las págs. 258, 261; Borrell Macías, *Responsabilidades Derivadas de Culpa Extracontractual Civil*, (2da. ed. 1958), Cap. II; Santos Briz, *Derecho de Daños* (ed. 1963) a las págs. 327–330; Puig Peña, *Derecho Civil*, Tomo I (ed. 1966) a la pág. 577.

Varias son las razones que se aducen por las autoridades para establecer la responsabilidad absoluta del manufacturero:

(1) Razones de política pública (seguridad humana).

(2) La necesidad de probar negligencia impone un peso indebido a la parte perjudicada.

(3) La imposición de la responsabilidad absoluta debe servir de incentivo a los manufactureros hacia la elaboración de productos seguros para el consumo.

(4) La responsabilidad absoluta es de hecho lo que está aplicando aunque con otro nombre.

(5) El manufacturero que es el generador original del riesgo está en mejor posición económica para cargar con este resultado.

(6) Es el productor el que induce al consumo o uso de su producto, indicando obviamente que su producto es susceptible de tal consumo o uso humano.

Véanse al efecto, Roberts, *Leading Comment*, 27 Mo. L. Rev. 194 (1962); Prosser *On Torts*, supra, a la pág. 674.

■ Ciertamente la norma más sabia y de mayor congruencia con la política pública es la de establecer la responsabilidad absoluta del fabricante para con el consumidor. Como expresó el Juez Presidente Traynor en *Grenman* v. *Yuba Power Products, Inc.*, 377 P.2d 897, 901 (Cal. 1962):

"El propósito de tal responsabilidad es asegurar que el costo de los daños resultantes de los productos defectuosos sean sufragados por los fabricantes que enviaron tales productos al mercado en vez de las personas damnificadas que están impotentes para protegerse ellos mismos."

Véase además, Fleming James, Jr., *General Products— Should Manufacturers Be Liable Without Negligence?*, 24 Tenn. L. Rev. 923 (1957).

■ Vale aclarar que si bien el consumidor no tiene que establecer directamente la negligencia del fabricante, el fabricante no es asegurador de todos los daños que puedan ocasionar sus productos. *Greenman* v. *Yuba Powers, Inc.*, supra; *Putman* v. *Erie City Manufacturing Co.*, 338 F.2d 911 (5th Cir. 1964). El embotellador de un refresco es responsable de los daños que cause el encontrarse un ratón descompuesto en una de sus botellas de refrescos. Ciertamente no es responsable de las caries que pueda causar el azúcar usada en el refresco. Si el daño no es atribuible a un defecto del producto, no hay base para aplicar la norma de responsabilidad absoluta. Ver Traynor, *The Ways and Means of Defective Products and Strict Liability*, 32 Tenn. L. Rev. 363, 367 (1965);[7] I Hursh, *American Law of Products Liability*, Sec. 5A-15A6 (1969 Supp.).

Siendo la norma de responsabilidad absoluta más razonable y respondiendo mejor a las necesidades sociales de Puerto Rico y no militando en contra de su adopción en nuestro medio jurídico ninguna disposición de nuestro ordenamiento legal, procede que la adoptemos en esta jurisdicción.

*Se revocará la sentencia y se dictará otra declarando con lugar la demanda condenando a la corporación demandada a*

---

[7] El Juez Presidente de California en este artículo sugiere la siguiente definición para "defecto": ". . . un producto defectuoso puede ser definido como aquel que falla en igualar la calidad promedio de productos similares, y el manufacturero es entonces responsable por los daños resultantes de las desviaciones de la norma."

*pagar al demandante la suma de $2,000 por concepto de los daños sufridos más la suma de $500 de honorarios de abogado y las costas.*