EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Luis González Cabán, et al<br><br>Peticionarios<br><br>v.<br><br>JR. Seafood, et al.<br><br>Recurridos | 2017 TSPR 187<br><br>198 DPR \_\_\_\_ |

Número del Caso: CT-2015-12

Fecha: 1 de diciembre de 2017

Abogados de la Partes:

       Lcdo. Wilfredo Géigel
       Lcdo. José Enrique Otero Matos
       Lcda. Ana María Otero
       Lcdo. Jaime Agrait Llado
       Lcda. Mildred Arroyo Figueroa
       Lcdo. Eduardo Cobián Roig
       Lcdo. José E. Dávila Acevedo

Materia: Responsabilidad civil extracontractual: Un camarón contaminado con saxitoxina no constituye un producto defectuoso y su venta no genera responsabilidad bajo la doctrina de responsabilidad estricta que ha desarrollado el Tribunal Supremo de Puerto Rico

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luis González Cabán, *et al.*
        Peticionarios

                v.

JR Seafood, *et al.*                    CT-2015-0012
        Recurridos


Opinión del Tribunal emitida por la Jueza Presidenta ORONOZ RODRÍGUEZ


En San Juan, Puerto Rico, a 1 de diciembre de 2017.

Mediante el proceso de certificación, el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico solicita que determinemos si, bajo nuestra doctrina de responsabilidad estricta, procede la imposición de responsabilidad por la venta de un camarón contaminado con una neurotoxina natural altamente venenosa. Por los fundamentos que exponemos, resolvemos que un camarón contaminado con saxitoxina no constituye un producto defectuoso que active la aplicación de esta doctrina. A continuación detallamos los hechos que dieron inicio a la controversia ante nuestra consideración, según éstos fueron expuestos en la solicitud de certificación.

I

El 19 de febrero de 2005, el Sr. Luis González Cabán acudió al Restaurante El Nuevo Amanecer y ordenó un surtido de aperitivos que contenía camarones. Tras ingerir uno de los camarones, comenzó a sentirse mal y desarrolló síntomas que provocaron que fuese trasladado al Hospital Menonita, en donde permaneció en condición crítica durante varios días.[1] Una vez estabilizado, y luego de recibir atención médica tanto en Puerto Rico como en Estados Unidos, el señor González Cabán fue diagnosticado con una intoxicación paralizante por mariscos (*Paralytic Shellfish Poisoning*) alegadamente ocasionada por los camarones que le fueron servidos en el restaurante.[2] A pesar de los múltiples tratamientos que recibió, el señor González Cabán no logró recuperarse y quedó confinado a una silla de ruedas.[3]

En consecuencia, el 24 de junio de 2014, el señor González Cabán y varios de sus familiares[4] (en conjunto, peticionarios) presentaron una demanda en daños y

_____

[1] En específico, el Sr. Luis González Cabán desarrolló los siguientes síntomas: diarreas, vómitos, mareos, hipotensión, hipocaliemia, síncope, disturbios sensoriales y motores, tetraplejia, desmielinización inflamatoria aguda, fallo renal, necrosis tubular aguda, trombocitopenia, gastroenteritis aguda, anemia, leucytosis, acidosis, azotemia y una erupción cutánea difusa en su abdomen y brazo.
[2] La intoxicación paralizante por mariscos es un "proceso neurológico tóxico producido después de comer almejas, ostras o mejillones que han ingerido unos protozoos venenosos llamados vulgarmente 'marea roja'. Los síntomas característicos aparecen al cabo de unos minutos, y consisten en náuseas, mareos, vómitos y hormigueo o adormecimiento alrededor de la boca, seguido de parálisis de las extremidades y, en algún caso, parálisis respiratoria". Diccionario Mosby: medicina, enfermería y ciencias de la salud, 6ta ed., Madrid, Ed. Elsevier Science, 2003, Vol. I, págs. 888-889.
[3] Además, el señor González Cabán no tiene control de su vejiga ni de su esfínter y perdió su deseo y capacidad sexual. *Opinion, Order and Certification to the Puerto Rico Supreme Court*, pág. 4.
[4] Los familiares demandantes incluyen al Sr. Braulio González Reyes, padre del señor González Cabán, y a las Sras. Jenifer González Maldonado y Arlene González Soto, hijas del señor González Cabán, quienes solicitan resarcimiento por las angustias mentales sufridas.

perjuicios ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico contra JR Seafood Inc., Integrand Insurance Company, Packers Provisions of Puerto Rico Inc. (Packers), Ramón Gutiérrez h/n/c GB Trading, Evaristo Rivera Berríos h/n/c Restaurante El Nuevo Amanecer y la Cooperativa de Seguros Múltiples de Puerto Rico (en conjunto, recurridos) solicitando compensación por los daños sufridos a raíz de su intoxicación.[5]

En su demanda, alegaron que JR Seafood Inc. importó un cargamento de camarones contaminados con saxitoxina, del cual vendió una porción a Packers quien, a su vez, vendió una porción a GB Trading.[6] Según explicaron, GB Trading vendió parte del cargamento al Restaurante El Nuevo Amanecer, quien finalmente ofreció el producto al señor González Cabán. Por consiguiente, alegaron que los recurridos eran solidariamente responsables por los daños causados al amparo de la doctrina de responsabilidad estricta por la venta de productos defectuosos. Asimismo, alegaron que los recurridos respondían por los daños ocasionados toda vez que violentaron la política pública al introducir en el comercio productos comestibles no aptos para el consumo humano.

---

[5] Cabe resaltar que los peticionarios interrumpieron oportunamente el término prescriptivo mediante la presentación de una demanda ante el Tribunal de Primera Instancia de Aibonito. Según surge del expediente, los peticionarios desistieron de esta reclamación en el 2014. *Opinion, Order and Certification to the Puerto Rico Supreme Court*, pág. 2.

[6] La saxitoxina es una "neurotoxina potente que se encuentra en los moluscos bivalvos, por ejemplo mejillones, almejas y vieiras. La producen ciertas especies de dinoflagelados, que son consumidos por los moluscos. La saxitoxina puede causar una grave intoxicación alimentaria en los seres humanos que comen marisco contaminado". <u>Diccionario Mosby: medicina, enfermería y ciencias de la salud</u>, op. cit., Vol. II, pág. 1417.

Packers presentó una moción de desestimación al amparo de la Regla 12(b)(6) de las Reglas de Procedimiento Civil Federal, pues entendió que la demanda instada en su contra no expuso una reclamación que justifique la concesión de un remedio.[7] En esencia, argumentó que los camarones contaminados no constituían un producto defectuoso porque, en nuestro ordenamiento jurídico, la doctrina de responsabilidad estricta es de aplicación únicamente cuando el defecto del producto es causado por el proceso de manufactura. En apoyo de su contención, citó con aprobación el voto concurrente del entonces Juez Asociado señor Negrón García en Méndez Corrada v. Ladi's Place, 127 DPR 568 (1990)(Resolución), en el cual el Juez explicó que un pez contaminado con ciguatera no constituía un producto defectuoso que activase la doctrina de responsabilidad estricta.[8] Además, enfatizó que la reglamentación aplicable no le imponía la obligación de realizar pruebas que detectasen la presencia de saxitoxina en los camarones por lo que, bajo el estado de derecho vigente, no era responsable por los daños ocasionados por ese producto.[9]

---

[7] Según surge del expediente, Integrand Assurance Company, Evaristo Rivera Berríos y la Cooperativa de Seguros Múltiples de Puerto Rico se unieron a la moción de desestimación presentada por Packers. *Opinion, Order and Certification to the Puerto Rico Supreme Court*, pág. 2.

[8] La intoxicación por ciguatera es una "intoxicación alimentaria no bacteriana producida por el consumo de pescado contaminado por la toxina ciguatera. Los síntomas de la intoxicación por ciguatera son vómitos, diarrea, entumecimiento o parestesias en las extremidades y en la piel que rodea la boca, prurito, debilidad muscular y dolor". Diccionario Mosby: medicina, enfermería y ciencias de la salud, op. cit., Vol. I, pág. 887.

[9] Tras la presentación de la moción de desestimación, los peticionarios enmendaron sus alegaciones y añadieron: (1) una causa de acción en daños y perjuicios al amparo del Artículo 1802 del Código Civil, 31 LPRA sec. 5141; (2) una causa de acción de saneamiento por vicios ocultos al amparo de los Artículos 1350, 1363 y 1373-1375 del Código

Por su parte, los peticionarios se opusieron a la solicitud de desestimación y alegaron que, conforme a la doctrina adoptada en Mendoza v. Cervecería Corona, 97 DPR 499 (1969), los recurridos eran solidariamente responsables por los daños causados. Además, argumentaron que Méndez Corrada v. Ladi's Place, supra, era distinguible toda vez que en esa época no existían procedimientos para detectar la presencia de la toxina en el producto mientras que, en el caso de autos, los recurridos hubiesen podido identificar el defecto mediante la realización de una prueba.

Tras evaluar las posturas de las partes, el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico determinó que no existían precedentes claros en nuestra jurisprudencia que atendiesen la controversia y nos certificó las siguientes preguntas:

> Under the principles of product liability, is a supplier/seller strictly liable for the damages caused by human consumption of an extremely poisonous natural toxin found in a shrimp, even if said food product (and its "defect") are not a result of manufacturing or fabrication process?
>
> If the previous question is answered in the affirmative, would it make a difference if the "defect" of the food product is readily discoverable scientifically or otherwise?

Con el beneficio de la comparecencia de ambas partes, estamos en posición de resolver.

---

Civil, 31 LPRA secs. 3801, 3831, 3841-3843; y (3) una causa de acción basada en la doctrina de beneficio económico, en la cual alegaron que los recurridos eran vicariamente responsables por los daños causados toda vez que se beneficiaron económicamente de la venta de los camarones contaminados.

## II

### A

La certificación interjurisdiccional es un instrumento procesal que permite a un tribunal someter preguntas, para su contestación definitiva, a otro tribunal de jurisdicción distinta, sobre cuestiones dudosas que se refieren al derecho de esa jurisdicción. Martínez Marrero v. González Droz, 180 DPR 579, 584-585 (2011); Muñiz-Olivari v. Stiefel Labs., 174 DPR 813, 817 (2008).

A través de esta figura, nuestro ordenamiento procesal civil nos permite atender cualquier asunto que nos sea certificado por un tribunal federal o por el más alto tribunal apelativo de cualquiera de los estados cuando dicho asunto implique cuestiones de derecho puertorriqueño que puedan determinar el resultado del pleito y sobre las cuales no existan precedentes claros en nuestra jurisprudencia. Art. 3.002(g) de la Ley de la Judicatura de 2003, 4 LPRA sec. 24s(g); Regla 25 del Reglamento de este Tribunal, 4 LPRA Ap. XXI-B, R. 25.

La expedición de este recurso es discrecional y las respuestas provistas a las preguntas certificadas constituyen cosa juzgada en cualquier procedimiento judicial ulterior entre las partes. Watchtower Bible et al. v. Mun. Dorado I, 192 DPR 73, 79 (2014); Guzmán v. Calderón, 164 DPR 220, 227 (2005). De esta forma, se evitan en gran medida las tensiones inherentes al sistema federalista y se salvaguarda la función de las cortes estatales de interpretar y formular

el derecho de los estados. Pan Ame. Comp. Corp. v. Data Gen. Corp., 112 DPR 780, 785 (1982).

B.

Nuestro ordenamiento jurídico confiere una causa de acción en daños y perjuicios a todo aquel que sufra un daño por las acciones u omisiones culposas o negligentes de otro.[10] Doble Seis Sport v. Depto. Hacienda, 190 DPR 763, 788 (2014); García v. E.L.A., 163 DPR 800, 809 (2005). Para que esta causa de acción prospere, el demandante deberá establecer: (1) que sufrió un daño; (2) a raíz de una acción u omisión culposa o negligente; y (3) la existencia de una relación causal adecuada entre dicha acción u omisión y el daño causado. Nieves Díaz v. González Massas, 178 DPR 820, 843 (2010); Rivera v. S.L.G. Díaz, 165 DPR 408, 421 (2005). Como puede apreciarse, la imposición de responsabilidad en estos casos se cimienta en la culpa o negligencia del demandado. Véase Rojas v. Maldonado, 68 DPR 818, 824 (1948).

Ahora bien, en ciertas instancias este Tribunal ha optado por adoptar teorías de responsabilidad objetiva con el fin de evitar los resultados injustos que pueden repercutir de la aplicación de la doctrina general de daños y perjuicios a ciertas actividades que resultan dañosas para la ciudadanía. H. M. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, 2da ed., San Juan, Pubs. JTS, 1986, Vol. II, pág. 873. Así, en Mendoza v. Cervecería

---

[10] A tales efectos, el Artículo 1802 de nuestro Código Civil dispone que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". 31 LPRA sec. 5141.

Corona, supra, incorporamos a nuestro ordenamiento jurídico la doctrina de responsabilidad estricta por la venta de productos defectuosos del derecho angloamericano, pues estimamos que era la norma que mejor atendía las necesidades sociales de nuestro país.[11]

Según hemos explicado, un producto defectuoso es aquel que falla en igualar la calidad promedio de productos similares. Rivera et al. v. Superior Pkg., Inc. et al., 132 DPR 115, 128 (1992); Montero Saldaña v. Amer. Motors Corp., 107 DPR 452, 462 (1978). Este Tribunal ha reconocido tres tipos de defectos que activan la aplicación de la doctrina de responsabilidad estricta, a saber: (1) defectos de fabricación; (2) defectos de diseño; y (3) defectos por insuficiencia en las advertencias o instrucciones.[12] Aponte v. Sears Roebuck de P.R., Inc., 144 DPR 830, 839-840 (1998).

Distinto a lo que ocurre en las acciones fundamentadas en negligencia, en estos casos el demandante prevalecerá siempre y cuando logre demostrar que el producto era defectuoso y que dicho defecto le ocasionó un daño. Íd., pág. 839.[13] De esta forma protegemos al consumidor pues lo

---

[11] No obstante, como veremos posteriormente, este no fue el primer caso que trató el tema, pues este Tribunal impuso responsabilidad estricta en Castro v. Payco, Inc., 75 DPR 63 (1953) bajo la teoría de la garantía implícita.

[12] Para una discusión sobre los tres tipos de defectos y sus respectivos requisitos, véase: Aponte v. Sears Roebuck de P.R., Inc., 144 DPR 830, 839 (1998); Rivera et al. v. Superior Pkg., Inc. et al., 132 DPR 115, 126 (1992); y Mendoza v. Cervecería Corona, 97 DPR 499 (1969).

[13] En específico, en Rodríguez Méndez v. Laser Eye, 195 DPR 769 (2016), expusimos que, para prevalecer en una acción de responsabilidad estricta, se deberá demostrar: "(1) la existencia de un defecto en el producto, ya sea de fabricación, de diseño, o por la insuficiencia de advertencias o instrucciones; (2) el defecto existía cuando el producto salió del control del demandado; (3) el demandado debe estar en el negocio de vender o distribuir del producto; [...]; (4) el defecto es la causa adecuada de los daños del demandante, y (5) el producto fue

eximimos de presentar prueba sobre la negligencia del vendedor o manufacturero. Rivera et al. v. Superior Pkg., Inc. et al., supra, pág. 126. Este proceder asegura "que el costo de los daños resultantes de los productos defectuosos sean sufragados por los fabricantes que enviaron tales productos al mercado en vez de las personas damnificadas que están impotentes para protegerse ell[a]s mism[a]s". Mendoza v. Cervecería Corona, supra, pág. 512 (citando a Grenman v. Yuba Powers, Inc., 327 P.2d 897, 901 (Cal. 1962)).

En nuestra jurisprudencia, tres casos atienden la imposición de responsabilidad por la venta de productos alimenticios no aptos para el consumo humano.

En Castro v. Payco, Inc., 75 DPR 63 (1953), nos enfrentamos por primera vez a una demanda instada en contra de un fabricante de productos comestibles. En esa ocasión, el Sr. Felipe Castro Betancourt alegó que sufrió una intoxicación severa tras consumir un helado de coco que Payco, Inc. (Payco) le vendió a través de uno de sus vendedores ambulantes. Luego de evaluar la prueba, el tribunal declaró con lugar la demanda y condenó a Payco al pago de trescientos dólares en concepto de daños y perjuicios.[14]

Inconforme con el resultado, Payco recurrió ante este Tribunal y solicitó la revisión de la sentencia. Ante la ausencia de un precepto legal que atendiese puntualmente la

---

utilizado para un uso razonable y de manera previsible por el demandado". Íd., págs. 780-781 (citas omitidas)(énfasis suprimido).

[14] La sentencia también incluyó el interés legal correspondiente, las costas del litigio y ciento cincuenta dólares en concepto de honorarios de abogado. Castro v. Payco, Inc., supra, págs. 65-66.

controversia, este Tribunal confirmó el dictamen mediante la adopción de la doctrina de la garantía implícita, la cual establece que "la persona que sirve o vende un producto alimenticio para el consumo humano garantiza de manera tácita que el producto es sano y apropiado para ser consumido por el hombre".[15] Íd., pág. 72.

Dieciséis años después, resolvimos Mendoza v. Cervecería Corona, supra, en el cual se instó una reclamación solicitando compensación por los daños sufridos a causa de la ingestión de una Malta Corona que contenía una "borra babosa de mal sabor" en el fondo de la botella. A diferencia de lo ocurrido en Castro v. Payco, Inc., supra, el demandante no adquirió el producto directamente del manufacturero, por lo que el tribunal sentenciador desestimó su reclamación por entender que la doctrina de garantía implícita era inaplicable.

Tras un breve recuento sobre los orígenes de la doctrina de responsabilidad estricta, revocamos al foro recurrido e incorporamos esta norma a nuestro acervo jurídico. No obstante, aclaramos que el fabricante no es asegurador de todos los daños que pueda ocasionar su producto, por lo que "[e]l embotellador de un refresco es responsable de los daños que cause el encontrarse un ratón descompuesto en una de sus botellas", pero no de las caries que pueda causar el azúcar utilizado en el refresco. Íd.,

---

[15] A igual resultado se llegó en Martínez v. Martínez, 78 DPR 235 (1955), en donde este Tribunal impuso responsabilidad bajo la figura de la garantía implícita por la venta de unos palitos de jacob que estaban contaminados con una bacteria.

pág. 512. Así, enfatizamos que el criterio principal para que prospere una causa de acción instada al amparo de esta doctrina es que el daño sea atribuible a un defecto del producto. Íd.

Poco más de veinte años más tarde, este Tribunal denegó la expedición de una solicitud de revisión en Méndez Corrada v. Ladi's Place, supra. En esa ocasión, el foro sentenciador declaró no ha lugar una demanda reclamando resarcimiento por el envenenamiento sufrido a causa del consumo de un pez ciguatóxico servido en un restaurante. El entonces Juez Asociado señor Negrón García emitió un voto concurrente en el cual expresó que coincidía con la determinación toda vez que "[l]a intoxicación por ciguatera no es el resultado de un proceso de fabricación o manufactura". Íd., pág. 570. En apoyo de su contención, el Juez enfatizó que la doctrina de responsabilidad estricta "persigue proteger al consumidor contra el descuido del manufacturero" e indicó que no existía forma de prevenir el envenenamiento, pues la toxina: (1) no se destruye por los métodos convencionales de cocina; (2) no se elimina por los métodos convencionales de manejo y procesamiento; y (3) no es detectable por el olor o la apariencia del pescado. Íd.

A la luz de este marco jurídico, procedemos a resolver.

## III

Como vimos, los peticionarios alegan que los camarones que le sirvieron al señor González Cabán constituyeron un

producto defectuoso que activa la doctrina de responsabilidad estricta,[16] mientras que los recurridos plantean que dicha doctrina es de aplicación únicamente cuando el defecto en el producto es causado por el proceso de manufactura.

Luego de evaluar los alegatos de las partes, así como los documentos que obran en el expediente, concluimos que la doctrina de responsabilidad estricta no aplica al caso de autos, ya que el defecto en el camarón no fue producto del proceso de manufactura.[17] Es decir, no medió intervención humana en la contaminación del camarón.

Como mencionamos, la doctrina de responsabilidad estricta "persigue proteger al consumidor contra el descuido del manufacturero". Méndez Corrada v. Ladi's Place, supra, pág. 570. Véase también Mendoza v. Cervecería Corona, supra; Castro v. Payco, Inc., supra. Por lo tanto, responsabilizar a los recurridos en un caso como el que nos ocupa en nada adelantaría los fines de la doctrina.

En última instancia, la norma adoptada en el día de hoy es la que mejor responde a las necesidades de nuestra sociedad, pues alcanza un justo balance entre la protección

---

[16] En apoyo de su contención, los peticionarios sostienen que el raciocinio utilizado en Méndez Corrada v. Ladi's Place, supra, no es de aplicación, pues en aquel momento no existían procedimientos para detectar un pez ciguatóxico, mientras que, hoy día, el defecto es identificable mediante la realización de una prueba.

[17] Así, aunque apliquemos los criterios dispuestos en Méndez Corrada v. Ladi's Place, supra, los recurridos no serían responsables por los daños causados ya que, al igual que la ciguatoxina, la saxitoxina: (1) se acumula en la víscera del camarón cuando éste consume ciertos dinoflagelados venenosos que producen la toxina; (2) no se elimina por los métodos convencionales de manejo y procesamiento, y (3) no se detecta por el olor o la apariencia del camarón.

al consumidor y la protección a la industria.[18]

IV

Por los fundamentos antes expuestos, concluimos que un camarón contaminado con saxitoxina no constituye un producto defectuoso que active la aplicación de la doctrina de responsabilidad estricta. En vista de que respondimos la primera interrogante en la negativa, resulta innecesario adentrarnos a considerar la segunda.

Se dictará Sentencia de conformidad.


                                        Maite D. Oronoz Rodríguez
                                              Jueza Presidenta

---

[18] Claro está, lo aquí resuelto no implica que, de cumplir con los estándares aplicables, los peticionarios estén impedidos de recobrar bajo otros preceptos de nuestro ordenamiento jurídico.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luis González Cabán, *et al.*
        Peticionarios

                    v.

JR Seafood, *et al.*                        CT-2015-0012
        Recurridos


SENTENCIA


En San Juan, Puerto Rico, a 1 de diciembre de 2017.

        Por los fundamentos antes expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, concluimos que un camarón contaminado con saxitoxina no constituye un producto defectuoso que active la aplicación de la doctrina de responsabilidad estricta.

        Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Rivera García disiente con opinión escrita, a la que se unieron la Jueza Asociada señora Pabón Charneco y los Jueces Asociados señor Kolthoff Caraballo y señor Estrella Martínez.


                    Juan Ernesto Dávila Rivera
                    Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Luis González Cabán<br>Peticionario<br><br>v.<br><br>JR Sea Food, y otros<br>Recurridos | CT-2015-0012 | |

**Opinión disidente emitida por el Juez Asociado SEÑOR RIVERA GARCÍA a la cual se unen la Jueza Asociada SEÑORA PABÓN CHARNECO, el Juez Asociado SEÑOR KOLTHOFF CARABALLO y el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ**

En San Juan, Puerto Rico, a de 1 de diciembre de 2017.

Los cuestionamientos presentados ante nuestra consideración nos permitían puntualizar, por primera vez, si un producto alimenticio y su defecto ⸺el cual surgió de forma natural⸺ está presto a ser considerado como un producto defectuoso para fines de la imposición de responsabilidad estricta. Una mayoría de este Tribunal, de manera errada, pautó que un camarón infectado con saxitoxina no podía ser un producto defectuoso que admitiera la imposición de la responsabilidad estricta por productos defectuosos que jurisprudencialmente formulamos Para arribar a esta determinación, fundamentó que la toxina no fue consecuencia de un proceso de fabricación sino que

surgió naturalmente.

Tras una exhaustiva investigación sobre el particular, en esta y en otras jurisdicciones, nos encontrábamos en posición de contestar esta interrogante en la afirmativa. Así, lo acertado era concluir que quien vende un producto alimenticio que contiene un defecto, aunque el mismo haya surgido sin mediar intervención del hombre, puede estar sujeto a la doctrina de productos defectuosos que anteriormente hemos enunciado. Por las razones que en breve pronunciaré, disiento del proceder de la mayoría de esta Curia.

A continuación esbozaremos los hechos materiales para justipreciar la controversia que tenemos ante nuestra consideración.

## I

El 19 de febrero de 2005 el Sr. Luis González Cabán (señor González Cabán) acudió al Restaurante El Nuevo Amanecer donde ordenó un plato que contenía camarones. Una vez comenzó a ingerirlos sintió una sensación de quemadura en su boca y en el estómago. Al cabo de poco tiempo comenzó a padecer síntomas de diarrea, vómitos, mareos, hipotensión, disturbios sensoriales y motores, falta de respiración, entre otros. Por ese motivo tuvo que ser transportado al hospital y, durante el transcurso del tiempo, ser sometido a múltiples tratamientos. A pesar que

su condición mejoró, el señor González Cabán quedó postrado a una silla de ruedas, ya que se le diagnosticó "incomplete quadriplegia".[19]

El 14 de junio de 2014 el señor González Cabán, Braulio González Reyes, Arlene González y Jennifer González Maldonado (en conjunto "los peticionarios") entablaron una demanda contra JR Seafood Inc., Integrand Insurance Company, Pakers Provisions of Puerto Rico Inc., Ramón Gutiérrez, Evaristo Rivera Berrios, el Restaurante El Nuevo Amanecer y la Cooperativa de Seguros Múltiples (en conjunto "los recurridos") en el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico (Tribunal de Distrito). En esencia, arguyeron que, a la luz de nuestra normativa de productos defectuosos, el camarón que ingirió el señor González Cabán era un producto defectuoso y que no se le advirtió sobre el defecto que tenía el camarón. Sostuvieron, también, que los recurridos eran solidariamente responsables por suplir un producto alimenticio insalubre. Ello, en contravención de la política pública que protegía al consumidor de los daños que sufre cuando un producto, el cual no es apto para el consumo, es puesto en el mercado.

Comenzado el proceso judicial, los recurridos presentaron una moción de desestimación. Tras ponderar las posiciones de las partes, el Tribunal de Distrito estimó

---

[19] El señor González Cabán solo recuperó movilidad en sus brazos y manos.

que la contención giraba sobre un asunto que no estaba del todo claro en nuestra jurisdicción. Consiguientemente, nos certificó las preguntas que transcribimos a continuación:

> Under the principles of product liability, is a supplier/seller strictly liable for the damages caused by human consumption of an extremely poisonous natural toxin found in a shrimp, even if said food product (and its "defect") are not result of manufacturing or fabrication process?
>
> If the previous question is answered in the affirmative, would it make a difference if the "defect" of the food product is readily discoverable scientifically or otherwise?

El 29 de enero de 2016 expedimos el recurso de certificación interjurisdiccional. Los peticionarios aducen que en Mendoza v. Cervecería Corona Inc., *infra*, adoptamos como política pública la responsabilidad absoluta de aquellos que venden productos alimenticios utilizando como fuente la Sec. 402(A) de la segunda edición del Restatement of The Law, Torts. Plantearon que la posterior casuística sobre productos defectuosos —que establece como defectos el de fabricación, diseño y falta de advertencias— no aplica a la controversia ante nuestra consideración, ya que ninguno de esos casos versaban sobre productos comestibles. Distinguen la presente controversia de lo que aconteció en Méndez Corrada v. Ladi's Place, *infra*. Esto, pues, cuando el señor González Cabán se intoxicó con saxitoxina, "era posible detectar dicha sustancia antes del consumo humano mediante pruebas, y era incluso posible 'limpiar' el

camarón de la toxina sencillamente quitándole la vísera o intestino".[20]

En la alternativa, los peticionarios solicitaron que adoptáramos el estándar de expectativas razonables desarrollado por diversos tribunales de los Estados Unidos. Señalan que, bajo este estándar, "existe responsabilidad absoluta si el consumidor no podía razonablemente anticipar la presencia de la sustancia dañina en el alimento, y tal sustancia conv[e]rtía el mismo en no apto para el consumo humano".[21]

Ahora expondremos el marco legal para disponer del asunto traído ante nos.

## II

Sabido es que los tribunales federales aplican el derecho estatal en pleitos de diversidad ciudadana.[22] El recurso de certificación interjurisdiccional es el instrumento procesal que posibilita que una corte de Estados Unidos someta ante nuestra consideración interrogantes sobre cuestiones dudosas o no resueltas del derecho puertorriqueño.[23] Este mecanismo es uno de suma significancia para los sistemas judiciales. Primero, propicia la colaboración útil entre la jurisdicción federal

---

[20] *Alegato de la parte demandante referente a las preguntas certificadas por el honorable Tribunal de Distrito Federal para el Distrito de Puerto Rico*, pág. 11.
[21] Íd.
[22] Pan American Computer Corp. v. Data General Corp., 112 DPR 780 (1982).
[23] Quilez-Velar v. Ox Bodies, 2017 TSPR 165, pág 5, 198 DPR ___ (2017).

y estatal.[24] Segundo, fomenta que se preserve y respete la función de interpretar y formular el derecho estatal que tienen los tribunales de los estados.[25]

Nuestra facultad para conocer la certificación es de carácter discrecional.[26] Empero, una vez acordamos expedir el recurso, nuestra potestad sobre el tema no es absoluta ya que estamos acotados por las preguntas que sometió la corte federal.[27] Esto, pues, el foro judicial que remite los planteamientos retiene jurisdicción sobre los méritos finales del caso y nuestra participación se circunscribe a replicar las interrogantes certificadas.[28] En otros términos, en los recursos interjurisdiccionales nuestra autoridad está limitada a atender los cuestionamientos presentados ya que si bien poseemos jurisdicción del asunto certificado, no la tenemos sobre los méritos de la reclamación que pende ante el foro federal.[29] Sin embargo, los términos específicos que empleó la corte federal no limitan nuestra facultad para exponer la controversia conforme a nuestro mejor entendimiento del expediente, ni tampoco restringe el ámbito de nuestra función interpretativa.[30]

Con esto en mente, pasamos a esbozar el marco jurídico asertivo para replicar las interrogantes planteadas.

---

[24] Watchtower Bible v. Mun. Dorado I, 192 DPR 73, 79 (2014).
[25] Íd, pág. 80.
[26] Pan American Computer Corp. v. Data General Corp., *supra*, pág. 788.
[27] Díaz Carrasquillo v. García Padilla, 191 DPR 97, 137 (2014).
[28] Íd., págs. 137-138.
[29] Íd., pág. 138.
[30] Watchtower Bible v. Mun. Dorado I, *supra*, pág. 81.

### III

Es harto conocido que en nuestro ordenamiento jurídico las obligaciones emanan de la ley, los contratos, los cuasi contratos y de los actos u omisiones ilícitos cuando media algún tipo de culpa o negligencia.[31] En lo referente a la responsabilidad civil extracontractual, el Art. 1802 de nuestro Código Civil preceptúa que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado".[32] En virtud de ello, se percibe que la norma general en Puerto Rico es que prevalece la responsabilidad basada en la culpa o negligencia.[33]

No obstante, desde hace tiempo, los estudiosos de la materia comenzaron a ponderar "sobre la necesidad de que se respondiera no solamente de los actos culpables, sino también de las consecuencias producidas por actividades perfectamente lícitas y diligentes".[34] Así, pues, excepcionalmente, existen circunstancias donde los legisladores y los foros judiciales reconocen la insuficiencia de la responsabilidad subjetiva y que su aplicación podría conllevar resultados injustos cuando se trata de actividades que son peligrosas para ciertos

---

[31] Art. 1042 del Código Civil de Puerto Rico, 31 LPRA sec. 2992.
[32] Art. 1802 del Código Civil de Puerto Rico, 31 LPRA sec. 5141.
[33] H. M. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, 1era ed., San Juan, Puerto Rico, Publicaciones JTS Inc., 1986, Vol. II, pág. 873.
[34] M. F. Martín Granizo, Los daños y la responsabilidad objetiva en el derecho positivo español, Ed. Aranzandi, Pamplona, 1972, pág. 103.

individuos.[35] En consideración de esto, a través de normas jurisprudenciales, hemos atemperado el rigor de la responsabilidad subjetiva al reconocer la responsabilidad objetiva ——también conocida como responsabilidad sin culpa—— en asuntos que no han sido específicamente regulados por la Asamblea Legislativa.[36]

La responsabilidad objetiva tiene como finalidad "proyectar sobre el agente causante directo o indirecto de un evento dañoso o perjudicial, las consecuencias económicas del daño, lesión o perjuicio, *con independencia absoluta de la diligencia, intencionalidad o negligencia de su conducta*".[37] Por ello, distinto a la responsabilidad subjetiva que se fundamenta en la culpa o negligencia, la responsabilidad objetiva no se justifica en un único principio, sino que se nutre de un conjunto de criterios.[38] En España hay juristas que, para justificar dicha responsabilidad,

> combinan la idea del «riesgo» con la de la «equidad»; otros con la de la falta, no faltando quienes sigan a estos criterios que bien pudiéramos llamar tripartito, en cuando fundamentan la llamada «responsabilidad sin culpa» en tres pilares: el riesgo, el sacrificio y la equidad; o en un «principio social»; no faltando, en fin, quienes traten de justificar este deber legal de resarcimiento en el Derecho Natural.[39]

---

[35] H. M. Brau del Toro, op. cit., pág. 873.
[36] Íd., pág. 881. (Énfasis suplido).
[37] M. F. Martín Granizo, op. cit., pág. 73. (Énfasis en el original).
[38] X. Basozabal Arrue, Responsabilidad extracontractual objetiva: parte general, Madrid, Agencia Estatal Boletín Oficial del Estado, 2015, pág. 55.
[39] M. F. Martín Granizo, op. cit., pág. 104. (Citas omitidas).

Como afirmamos, la doctrina científica española estima que esta responsabilidad está cimentada "sobre la base del *riesgo* que para la comunidad representa el ejercicio o desarrollo de ciertas actividades, que si bien necesarias para aquella, son fuentes de numerosos daños y perjuicios para sus miembros".[40] Ese riesgo "exige que al ser la Sociedad un ente abstracto a través de cuya organización se benefician todos y cada uno de sus miembros, deba hacerse derivar sobre quien directa e indirectamente se beneficia del objeto o servicio que crea ese *riesgo* y provoca el daño, las consecuencias perjudiciales o dañosas derivadas de su uso".[41] Sin embargo, la sociedad no puede resarcir directamente esos daños, por lo tanto

> para poder cumplir con el postulado de dar a cada uno lo suyo, hace entrar en juego, secundariamente, los principios de la Justicia conmutativa sobre la base de arbitrar una serie de normas que regulando supuestos impongan al causante del daño, al guardador de la cosa u objeto que lo produce, o al dueño, aún cuando en ninguno de ellos haya habido dolo o culpa, la obligación de indemnizar el resultado dañoso producido dando al perjudicado «lo suyo» y convirtiendo al agente originador del daño, en sujeto pasivo del «dar» en representación de la Sociedad.[42]

En síntesis, la teoría del riesgo postula que la persona que crea un riesgo debe ser responsable del daño que este ocasiona.[43] Esta norma usualmente aplica a

---

[40] Íd., pág. 74.
[41] Íd. (Énfasis en el original).
[42] Íd., pág. 108.
[43] C. J. Irizarry Yunqué, <u>Responsabilidad Civil Extracontractual</u>, Colombia, Panamericana Formas e Impresos S. A., 7ma ed., 2009, pág. 55.

actividades generadoras de provecho económico o que por su regularidad permiten calcular y asegurar el riesgo.[44] Esto, ya que "[e]s justo que una empresa de lucro o alguien empeñado en un quehacer peligroso responda usualmente de los riesgos que sus actividades creen y **que puedan preverse en un orden normal** aunque no puedan evitarse con el ejercicio de la mayor prudencia".[45]

En el paradigma de la responsabilidad objetiva se encuentra la responsabilidad por productos defectuosos.[46] Esta obligación responde a una razón más lógica contractual que extracontractual: "el consumidor puede legítimamente esperar que el producto tenga la misma seguridad que los de su misma serie, pues el fabricante *garantiza* la seguridad de su producto".[47] Entonces, adquiere importancia el criterio de comunidad de riesgo, es decir, que "el fabricante que responde de manera objetiva por los daños que causen sus productos defectuosos actúa como asegurador de esos daños incorporando al precio del producto la prima

---

[44] Jiménez v. Pelegrina Espinet, 112 DPR 700, 703 (1974).
[45] Íd.(Énfasis suplido).
[46] X. Basozabal Arrue, op. cit., pág. 59. Véase además, H. M. Brau del Toro, op. cit., pág. 881.
Resaltamos que en Rodríguez Méndez v. Laser Eye, 195 DPR 769, 779 n.4 (2016), citando a R. P. Rodríguez Montero, Responsabilidad civil de profesionales y empresarios: aspectos nacionales e internacionales, España, Gesbiblo S.L., 2006, pág. 251, aclaramos que "[d]esde un punto de vista sustantivo, la legislación española vigente coincide con el sistema americano, al imponer al fabricante una responsabilidad objetiva 'por los daños causados por productos que no ofrezcan la seguridad que cabría esperar'. Esta 'establece un sistema similar al de la responsabilidad estricta, bajo la cual una parte demandante debe demostrar el defecto de producto, que éste existía cuando el producto salió de la esfera del fabricante y que el producto le causó un daño mientras lo utilizaba de un modo razonable'". Íd.
[47] X. Basozabal Arrue, op. cit., pág. 60. (Énfasis en el original).

del seguro".[48] De esa forma, "se centraliza la cobertura de los daños por defectos, cuyo coste repercutirá entre todos los compradores en beneficio de los que adquieran el producto defectuoso".[49]

## A. **Responsabilidad por productos defectuosos en Estados Unidos**

Tras su desarrollo jurisprudencial, la doctrina define la responsabilidad por productos defectuosos como el área del Derecho que rige la responsabilidad de los vendedores de bienes muebles a terceras personas con quienes no tienen un vínculo contractual.[50] Dicha normativa lo que pretende es delimitar la responsabilidad legal de los vendedores y distribuidores respecto a los daños que esos productos perpetúen.[51]

A finales del siglo XIX una persona damnificada por un producto defectuoso no podía instar una acción contra el fabricante de dicho producto a falta de un vínculo contractual con éste.[52] Es decir,

> un fabricante o un proveedor de un bien mueble o un producto de consumo, era responsable en negligencia, por los daños físicos y morales a la persona, y por los daños físicos a las cosas tangibles, causados por el uso o consumo de dicho bien mueble, o producto de consumo defectuoso, siempre y cuando que el perjudicado tuviese relación contractual con el referido proveedor o fabricante.[53]

---

[48] Íd.
[49] Íd.
[50] W. L. Prosser, Law of Torts, 4ta ed., Ed. West Publishing Co., 1971, pág. 641.
[51] D. G. Owen y otros, Product Liability and Safety, 5ta ed., United States, Ed. Thomson West, pág. 14.
[52] Íd., pág. 20.
[53] H. M. Brau del Toro, op. cit., pág. 883.

Este requerimiento se utilizó como un instrumento de política social para que la Nación promoviera el desarrollo de las industrias.[54] Además, debemos resaltar que, aunque se exigía un vínculo contractual entre las partes, la acción en reclamo de daños y perjuicios sufridos era de índole extracontractual.[55]

A pesar de ser esta la norma imperante, en vista de que el sistema comercial se tornó complejo, los tribunales en Estados Unidos estimaron apropiado flexibilizar esta doctrina y comenzaron a desarrollar varias excepciones.[56] En este contexto destacamos las siguientes:

> a. Si el vendedor conocía que el bien mueble era peligroso para el uso que se le intentaba dar y dejaba de revelar ese hecho al comprador, era responsable tanto al comprador como a una tercera persona por los daños causados por tal uso.
> b. Se imponía responsabilidad cuando el bien mueble era suministrado para ser usado en el recinto del fabricante o suplidor, en cuyo caso se consideraba al usuario como un invitado.
> c. La más importante excepción disponía que el fabricante o el vendedor era responsable tanto al comprador como a una tercera persona por la negligencia en la preparación o venta de un artículo inminente o inherentemente peligroso a la seguridad humana.[57]

Sin embargo, no fue hasta que el Tribunal de Apelaciones del estado de Nueva York resolvió MacPherson v. Buick Motor Co, 11 N.E. 1050, que se entiende que nació la

---

[54] D. G. Owen y otros, op. cit., pág. 20.
[55] H. M. Brau del Toro, op. cit., pág. 883.
[56] J. T. O'Reilly, Product defects and hazards litigation and regulatory strategies, Estados Unidos, Ed. Wiley Law Publications, 1987, pág. 10.
[57] H. M. Brau del Toro, op. cit., pág. 884.

normativa moderna sobre productos defectuosos.[58] Esto, toda vez que se resolvió que "el manufacturero de este artículo de peligro está bajo el deber de fabricarlo con cuidado, **irrespectivamente del contrato**".[59] De este modo, se comenzó a abolir la necesidad de tener una relación contractual para poder entablar una acción de daños y perjuicios por productos defectuosos. No obstante, el demandante aún estaba obligado a evidenciar que el demandado incurrió en culpa o negligencia.[60]

Entre el 1930 al 1940, la doctrina norteamericana comenzó a propiciar la idea del Derecho de Daños como un sistema de compensación a víctimas.[61] Se desarrolló literatura que aclamaba un régimen de responsabilidad estricta, especialmente en los casos de productos defectuosos.[62] En apoyo a ese reclamo, se utilizaron como fundamentos los siguientes: *primero,* la capacidad del manufacturero para repartir el costo de los accidentes mediante pólizas de seguros; *segundo,* que resultaba injusto permitir que las víctimas de accidentes no fueran compensadas; y, *tercero,* que se debía maximizar la protección al consumidor.[63] De esta forma, "se acentuó la búsqueda de otras teorías de responsabilidad que no sólo obviaran el requisito de la existencia de un vínculo

---

[58] D. G. Owen y otros, op. cit., pág. 21.
[59] MacPherson v. Buick Motor Co, *supra*, pág. 1053. (Énfasis suplido).
[60] D. A. Fischer, *Product Liability Case and Materials*, West Academic Publishing, Estados Unidos, 5ta ed., 2014, pág. 3.
[61] M. A. Kotler, Product Liability and Basic Tort Law, Carolina del Norte, Ed. Carolina Academic Press, 2005, pág. 128.
[62] Íd.
[63] Íd.

contractual entre el perjudicado y el demandado **sino que superaran las dificultades ajenas a la carga de probar negligencia por parte del fabricante o vendedor**".[64]

Para el 1963 el tribunal de mayor jerarquía del estado de California decidió Greenman v. Yuba Power Products, Inc., 377 P.2d 897 (Cal. 1962), donde adoptó la responsabilidad estricta de los vendedores de productos defectuosos.[65] Ello, al concluir que "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being."[66] Desde entonces, los tribunales de la Unión Americana comenzaron a inclinarse a la responsabilidad sin culpa, en ciertas circunstancias.[67] De forma que ya **no es necesario que el fabricante actúe, o no, de forma culposa o negligente**, ni demostrar que se incumplió con un deber jurídico de actuar.[68]

**B. Responsabilidad por productos defectuosos en Puerto Rico**

En Puerto Rico, hace varias décadas atrás, en mira de nuestras necesidades sociales y como cuestión de política

---

[64] H. M. Brau del Toro, op. cit., pág. 888. (Énfasis suplido).
Es preciso mencionar que un estudio de la evolución de la doctrina de productos defectuosos permite entender que, durante su desarrollo, los tribunales se basaron en diversas fuentes de responsabilidad tales como la negligencia, incumplimiento de garantía implícita y responsabilidad estricta. D. G. Owen y otros, op. cit., pág. 14.
[65] D. A. Fischer, op. cit., pág. 3.
[66] Greenman v. Yuba Power Prods. Co., Inc., 59 Cal. 2d 57, 377 (1962).
[67] D. G. Owen y otros, op. cit., pág. 19.
[68] J. T. O'Reilly, op. cit., pág. 19.

pública, adoptamos la norma de responsabilidad estricta de los fabricantes y vendedores de productos defectuosos.[69] Pautamos que "todos los actores que intervienen en la cadena de fabricación y distribución de un producto defectuoso responden solidariamente y sin necesidad de demostrar negligencia frente al perjudicado".[70] Dispusimos que "el fabricante de un producto y todos los participantes en la cadena de distribución tienen la obligación de insertar en el mercado productos que se encuentren libres de defectos".[71]

No obstante, hemos puntualizado que el fabricante —así como la cadena de distribución— no son aseguradores de todos los daños que sus productos puedan ocasionar.[72] En consideración a ello, hemos erigido ciertos requisitos que se han de acreditar para poder incoar una acción de responsabilidad estricta por productos defectuosos. Particularmente, el demandante tiene la carga de evidenciar lo siguiente: (1) que el producto tiene un defecto, ya sea en la fabricación, diseño o por insuficiencia de advertencias o instrucciones; (2) que ese defecto existía

---

[69] _Rivera et al. v. Superior Pkg., Inc. et al._, 132 DPR 115, 125 (1992).
Es menester apuntar que en _Rodríguez Méndez v. Laser Eye_, _supra_, pág. 779, aclaramos que "la nomenclatura que hemos empleado para describir esta doctrina de responsabilidad civil extracontractual no es la más apropiada. La corriente moderna ha preferido denominarla como responsabilidad 'estricta' en lugar de 'absoluta'. Esto es la fiel máxima de que, si bien la negligencia del demandado no es un requisito de la causa de acción, se debe probar la existencia de algún fallo en el producto que sea la causa adecuada de los daños sufridos por el demandante".
[70] _Rodríguez Méndez v. Laser Eye_, _supra_, pág. 779.
[71] Íd., pág. 787.
[72] _Rivera et al. v. Superior Pkg., Inc. et al._, _supra_, pág. 127; _Aponte v. Sears Roebuck de P.R., Inc._, 144 DPR 830, 839 (1998).

cuando el producto salió del control del demandado; (3) que el demandado está en el negocio de vender el producto; (4) que el defecto es la causa adecuada de los daños que sufrió el demandante; y (5) que el demandante utilizó el producto de una manera que era razonable y previsible para el demandado.[73]

Como acabamos de expresar, uno de los elementos que se debe probar para poder presentar una acción de responsabilidad estricta por productos defectuosos es que el producto contenía un defecto, bien sea por la manera en que se fabricó, diseñó o por que no se proveyó advertencias o instrucciones suficientes sobre el producto.[74] Un producto contiene un defecto en la fabricación cuando falla en igualar la calidad promedio de productos similares.[75] En tal caso, el defecto se produce "ante la incapacidad del producto de desempeñar su función de la manera prevista como consecuencia de alguna falla en su proceso de producción o creación".[76]

Por otro lado, el defecto en el diseño "no puede identificarse simplemente mediante la comparación del producto que produjo el daño con los planos del fabricante o con otras unidades de la misma línea de producción, ya que, por definición, todas esas unidades poseerán el mismo

---

[73] Rodríguez Méndez v. Laser Eye, *supra*, págs. 780-781.
[74] Aponte v. Sears Roebuck de P.R., Inc., *supra*, pág. 840.
[75] Rodríguez Méndez v. Laser Eye, *supra*, pág. 781.
[76] Íd.

diseño".[77] Este defecto, "se moldeó con el tiempo hasta componerse de un análisis bipartito constituido por los escrutinios conocidos como el *Consumer Expectations* y el *Risk Utility*".[78] Recientemente, citando una determinación del Tribunal Supremo del estado de Nueva York, dispusimos que

> '[a] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use,' and 'whose utility does not outweigh the danger inherent in its introduction into the steam of commerce'.[79]

Por último, el defecto en las advertencias o instrucciones insuficientes consiste en la carencia en el producto de instrucciones o advertencias sobre los riesgos previsibles vinculados con su uso.[80] A tales efectos, un producto puede considerarse defectuoso si el fabricante o vendedor: (1) no facilitó instrucciones sobre el manejo del producto; (2) no advirtió los posibles riesgos en el uso del producto, ya fueran latentes u ocultos; (3) no alertó sobre las consecuencias dañinas que pudieran desatar el uso incorrecto del producto; o (4) no proporcionó instrucciones sobre la manera de evitar lesiones.[81]

---

[77] Íd.
[78] Íd.
[79] Íd., págs. 781-782.
[80] Íd., pág. 782.
[81] Íd.

## C. **Productos alimenticios defectuosos**

Actualmente, la responsabilidad estricta por los daños ocasionados por productos alimenticios defectuosos se rige por las mismas normas que gobiernan los productos no comestibles.[82] La primera vez que nos expresamos dentro de este contexto fue en Castro v. Payco, Inc., 75 DPR 63 (1953). En esa ocasión, determinamos que Payco ⸺fabricante de un mantecado de coco⸺ respondía al señor Castro por la intoxicación que este último sufrió al ingerir el producto que introdujo al mercado. Resolvimos que en nuestra jurisdicción era de aplicación la normativa de garantía implícita que postula que quien se **sirve o vende** un producto alimenticio garantiza de forma tácita que el mismo es sano y apropiado para ser consumido.[83]

Para arribar a esta conclusión, utilizamos como fuente la Ley de Alimentos, Drogas y Cosméticos de Puerto Rico, Ley Núm. 72 de 16 de abril de 1940, 24 LPRA sec. 711, la cual prohíbe que se fabrique, venda, entregue u ofrezca en venta un alimento, droga, artefacto o cosmético que esté adulterado.[84] Específicamente, el estatuto establece que un alimento se considera adulterado cuando "contiene alguna

---

[82] Restatement of the Law, Third, Torts Product Liability, American Law Institute, 1998, pág. 160. Además, la Sec. 7 de la tercera edición del Restatement of the Law establece lo siguiente: "One engaged in the business of selling or otherwise distributing food products who sells or distributes a food product that is defective under §2, §3, or §4 is subject to liability for harm to persons or property caused by the defect. Under §2(a), a harm-causing ingredient of the products constitutes defect if a reasonable consumer would not expect the food product to contain that ingredient. Íd.
[83] Castro v. Payco, Inc., 75 DPR 63, 73 (1953).
[84] Al presente, la aludida disposición legal se encuentra vigente.

sustancia venenosa o deletérea que lo haga perjudicial a la salud; pero en caso de que la sustancia no fuere añadida, el alimento no se considerará adulterado en virtud de este inciso, siempre que la cantidad de dicha sustancia no lo convierta en perjudicial a la salud".[85] En consideración a esto, resolvimos que "cuando un fabricante de un producto alimenticio lo pone a la **venta** para el consumo humano, la presunción es que ha dado cumplimiento a la ley, que ha puesto en el mercado un artículo no adulterado y que **garantiza que es apropiado** para el fin a que el producto se destina".[86]

La segunda ocasión que atendimos este asunto fue en Mendoza v. Cervecería Corona, 97 DPR 499 (1969). En ese caso, el señor Mendoza compró unas maltas en un almacén. Al ingerir una de ellas sintió una borra babosa de mal sabor. Puesto que comenzó a sentirse mal, acudió al hospital donde se le diagnosticó intoxicación estomacal y fue hospitalizado por dos días. A raíz de estos hechos, el señor Mendoza demandó a la Cervecería Corona, compañía que fabricó el producto. El Tribunal de Primera Instancia determinó que no aplicaba la doctrina de garantía implícita y que el señor Mendoza no probó que la Cervecería Corona actuó de manera negligente.

Al disponer de la controversia, analizamos la Sec. 402A del Restatement of Torts, Second, que establece que:

---

[85] 24 LPRA sec. 720.
[86] Castro v. Payco, Inc., *supra*, pág. 72. (Énfasis suplido).

(1) Cualquiera que **vendiese** un producto con una condición defectuosa, irrazonablemente peligrosa al consumidor o comprador o a su propiedad, está sujeto a responsabilidad por daños físicos de tal modo causados al último consumidor o comprador, o a su propiedad, si (a) el vendedor está envuelto en el negocio de venta de tal producto, y (b) se espera que llegue y así llega al consumidor o comprador sin ningún cambio sustancial en la condición en que fue vendido. (2) La regla expresada en la Subsección (1) aplica aunque (a) el vendedor haya ejercido todo el cuidado posible en la preparación y venta de su producto, y (b) el consumidor o comprador no haya comprado el producto de/o haya entrado en alguna relación contractual con el vendedor.[87]

Asimismo, haciendo referencia a los comentarios del Restatement of Torts, Second, consignamos que

[b]ajo cualquier teoría, la justificación para la responsabilidad absoluta se ha dicho que es que **el vendedor, por el hecho de poner en el mercado su producto para el uso y consumo, se ha comprometido y ha asumido una responsabilidad especial en relación a cualquier miembro del público consumidor que pueda resultar damnificado por est[e]**; en el caso de productos necesarios y para los cuales tiene que forzosamente descansar en el vendedor, el público tiene derecho a esperar y así lo hace, que los vendedores de buena reputación se mantendrán detrás de sus bienes; **que la política pública exige que el peso de los daños accidentales causados por productos hechos para el consumo recaiga en aquellos que lanzaron al mercado, y que se le trate como un costo de producción contra el cual se puede obtener una póliza de seguro; y que el consumidor de tales productos tiene derecho a la protección máxima en manos de alguien, y las personas apropiadas a afrontar esto son aquellas que lanzaron el producto al mercado.**[88]

En virtud de lo que antecede, determinamos en aquella ocasión que la norma más sabia y congruente con nuestra

---

[87] Mendoza v. Cervecería Corona, *supra*, pág. 508. (Énfasis suplido).
[88] Íd., págs. 508-509. (Énfasis suplido).

política pública era la responsabilidad estricta del fabricante para con el consumidor.[89]

Nótese que en los dos casos sobre productos alimenticios defectuosos que han llegado ante nuestra consideración, los productos ——el helado de coco y la malta—— fueron consecuencia de la intervención humana. Empero, nunca nos hemos pronunciado sobre la posibilidad de que un producto comestible, el cual no fue fabricado, *per se*, sino que emanó naturalmente, pueda ser un producto defectuoso sujeto a la doctrina de responsabilidad estricta. En ese sentido, está claro que la materia prima puede ser producto de alguna empresa humana, tal como lo es la minería, la agricultura y la pesca.[90] A continuación, nos dirigimos a otras jurisdicciones para estudiar el tratamiento que se les ha conferido a esta clase de productos.

Desde el pasado siglo, en <u>Kenower v. Hotels Statler Co.</u>, 124 F.2d 658 (6to Cir. 1942), el Tribunal Federal de Apelaciones para el Sexto Circuito sostuvo que el hotel demandado respondía a un huésped que ingirió unas almejas que le provocaron fiebre tifoidea. Varios años más tardes, en <u>Greenberg v. Lorenz</u>, 9 N.Y.2d 195, 213 N.Y.S.2d 49, 173 N.E.2d 773 (1961), la corte intermedia del estado de Nueva York decidió que un menor de edad podía recuperar los daños

---

[89] Íd., pág. 511.
[90] J. J. Phillips, R. E. Pryor, <u>Product Liability</u>, Ed. LexisNexis, Vol. 1, sec. 1.02[1], pág. 1-8.

que sufrió al fracturarse un diente con un pedazo de metal que encontró en una lata de salmón.

Más reciente, en Woeste v. Washington Platform Saloon & Restaurant, 836 N.E.2d 52 (2005), el señor Woeste, quien padecía de Hepatitis C, consumió una docena de ostras crudas en el restaurante Washington Platform y feneció una semana más tarde. El menú del restaurante advertía sobre los riesgos que implicaba comer mariscos sin cocinar.[91] Como consecuencia de la muerte del señor Woeste, sus familiares incoaron una acción, basada en responsabilidad absoluta por falta de advertencias adecuadas de los riesgos asociados al consumo de ostras crudas, contra Johnny's Oyster & Shrimp —compañía que cosechó las otras— y Washington Platform. Aseveraron que no se advirtió que consumir ostras crudas podía provocarle la muerte a aquellas personas cuyo sistema inmunológico era débil, como lo es el caso de los individuos que padecen de Hepatitis C. El Tribunal de Apelaciones de Ohio resolvió que "the warning provided was one that a manufacturer exercising reasonable care would have issued. It adequately put a patron on notice of the risk associated with eating raw shellfish, including raw

---

[91] A esos fines, el menú contenía, justo debajo de la parte de las ostras, la siguiente advertencia: "Consumer Information: There may be risks associated when consuming shell fish as in the case with other raw protein products. If you suffer from chronic illness of the liver, stomach or blood, or if you are pregnant or if you have other immune disorders, you should eat these products fully cooked". Mientras que el saco de ostras que vendió Johnny's advertía que "[t]here is a risk associated with consuming raw oysters or any raw animal protein. If you have chronic illness of the liver, stomach or blood or have immune disorders, you are at great risk of serous [sic] illness from raw oysters and should eat oysters fully cooked. If unsure of your risk, consult a physician".

oysters."[92] En términos simples, el foro apelativo intermedio dictaminó que las advertencias que efectuó el restaurante demandado eran adecuadas.

En Bissinger v. New Country Buffet, 2014 Tenn. App. LEXIS 331, la controversia también se suscitó por el consumo de unas ostras sin cocinar. En este caso, el señor Bissinger, también paciente de Hepatitis C, ingirió tres ostras crudas en el restaurante New Country. Luego, dado a que comenzó a sentirse mal, acudió al hospital donde permaneció hospitalizado por 143 días hasta que pereció como consecuencia de una bacteria en la sangre. Por ello, se instó una acción por productos defectuosos contra los suplidores de las ostras.

El tribunal de distrito resolvió que los suplidores no eran fabricantes de las ostras y, por lo tanto, estaban inmunes de responsabilidad. Esto, pues, en el estado de Tennesee se admitía la doctrina del "sealed container" que cobijaba de responsabilidad por productos defectuosos al vendedor de un producto fabricado o producido por otra persona o empresa. El Tribunal Apelativo del estado de Tennessee revocó esa determinación y dictaminó que los

---

[92] Woeste v. Washington Platform Saloon & Restaurant, *supra*, pág. 56. También se concluyó que las ostras que contenían la bacteria de Vibrio no podían ser consideradas como un producto defectuoso toda vez que no se podían entender como un producto adulterado a la luz del Ohio's Pure Food and Drug Law. Esto, pues, al igual que Puerto Rico, dicho estatuto requería que la sustancia fuera perjudicial a la salud. El foro sentenciador destacó que el Vibrio es una bacteria que ocurre naturalmente y que, generalmente, no conlleva riesgos mayores, excepto a las personas cuyo sistema inmune es débil o tienen alguna enfermedad estomacal. Por consiguiente, las ostras no eran perjudiciales a la salud y por ende no eran un producto adulterado.

suplidores no se encontraban protegidos por la normativa

del contenedor sellado pues estos eran fabricantes.

Particularmente, el aludido foro expresó lo siguiente:

> [s]ince oysters are a natural product, it may seem counterintuitive to consider Suppliers to be their 'manufacturers'. Nonetheless, contrary to the holding of the trial court, the Suppliers do meet the definition of 'manufacturers' under the Product Liability Act. Tennessee Code Annotated sec. 29-28-102(4) defines a 'manufacturer' as 'the designer, fabricator, producer, compounder, processor or assembler of any product or its component parts'. **Bon Secour and Leavins both refer to themselves as processors, and even if their processing only consists of washing, refrigerating and packing the oysters, they must be considered manufacturers under the statute.** Further, Tittle 21 of the Code of Federal Regulations which governs food and drugs includes 'handling' and 'storing' of fish or fishery products in its definition of 'processing'. 21 CFR 123.3(k) and (l). (Énfasis suplido).[93]

En otras palabras, estimó que los suplidores al

procesar las ostras, bien sea porque las lavaron,

refrigeraron o empacaron, se convirtieron en sus

fabricantes. Cónsono con ello, el autor Michael I. Krauss

considera que:

> [s]ome foods originating in nature (for instance, McDonald's Chicken McgNuggets®…) are actually 'manufactured' in the sense that they are substantially processed. **But many food products are items already substantially found in nature, merely picked, cleaned and packaged by the producer. A packaged salad containing a rusty nail is surely a product with 'manufacturing' defect.**[94]

---

[93] <u>Bissinger v. New Country Buffet</u>, supra, págs. *26-*27.
[94] M. I. Krauss, <u>Principles of Product Liability, United States</u>, 2nda ed., Estados Unidos, Ed. West Academic Publishing, 2014, pág. 101.

Es decir, el estudioso de la normativa estima que un producto alimenticio, el cual no es creado propiamente, podría contener un defecto, incluso, de fabricación y así convertirse en un producto defectuoso. Es por ello que quien empaca una lechuga para hacer una ensalada ——producto comestible que surge de la naturaleza— podría estar sujeto a responsabilidad por los daños que sufra un consumidor que encuentre un clavo dentro del producto comestible.[95]

Por último, en Lagan v. BJ's Wholesale Club, Inc., 2006 U.S. Dist. LEXIS 64673, la controversia giró entorno a una carne molida la cual estaba contaminada con la bacteria de Escherichia coli (E. coli). El caso surgió pues un menor de edad fue ingresado al hospital donde se le diagnosticó la infección de E. coli.[96] Las agencias encargadas de la salud en los estados de Nueva York y Nueva Jersey concluyeron que la bacteria fue causada por una carne molida que se adquirió en el establecimiento BJ's Wholesale Club. A base de ello, los padres del menor presentaron una acción de responsabilidad absoluta contra BJ's Wholesale Club.

---

[95] Íd.

[96] El foro plasmó que el Hemolytic Uremic Syndrome es una complicación del E. coli que puede ser fatal.
La escherichia se define como "[g]enero de bacteriáceas que se encuentran normalmente en el tubo digestivo de los animales y del hombre; fermentan los hidratos de carbón. Entre las especies principales se citan E. coli, bacilo corto, gramnegativo, móvil; no patógeno en muchas ocasiones, pero del tubo digestivo pasa a la sangre e invade la vesicular y conductos biliares y también produce lesiones en las vías urinarias." Diccionario enciclopédico university de términos médicos, Ed. Interamericana S. A. de C. V., México, 1981, pág. 376.

Al disponer del asunto, el Tribunal de Distrito de Estados Unidos para el Distrito de Nueva Jersey determinó que BJ's Wholesale Club era un manufacturero para fines de responsabilidad por productos defectuosos pues molió, empacó y etiquetó el producto. Consideró el New Jersey Product Liability Act, NJSA sec. 2A:58C-1 et seq., que definía el término manufacturero como exponemos a continuación:

> (1) any person who designs, formulates, produces, creates, makes, packages, labels or constructs any product or component of a product; (2) a product seller with respect to a given product to the extent the product seller designs, formulates, produces, creates, makes, packages, labels or constructs the products before its sale; (3) any product seller not described in paragraph (2) which holds itself out as a manufacturer to the user of the product; or (4) a United States domestic sales subsidiary of a foreign manufacturer if the foreign manufacturer has a controlling interest in the domestic sales subsidiary.

De otro modo, el mencionado foro tuvo que justipreciar si el hecho de que la carne molida estuviera contaminada con E. coli la convertía en un producto defectuoso. Después de considerar un informe pericial que identificó la fuente del defecto como el animal de donde provino la carne, concluyó como sigue:

> **[h]ere, the contamination with E. coli created a defect as this was a deviation from the expected performance standard of the meat**. In addition, the E. coli contamination violated New Jersey law prohibiting the sale of food items that are 'injurious to health'.[97]

---

[97] Lagan v. BJ's Wholesale Club, Inc., *supra*, pág. *14.

Hasta el momento, podemos observar que los foros judiciales de varios estados de la Unión Americana permiten la interposición de una acción de responsabilidad estricta por productos defectuosos aunque el producto no haya sido creado por el demandado. Es decir, diversas cortes coinciden que el hecho de que un producto no sea fabricado *per se* ⸺como las ostras y las almejas⸺ no impide que ese bien se considere como un producto defectuoso. Incluso, en los casos examinados vemos que el defecto ⸺como el E. coli en la carne molida⸺ no necesariamente tiene que haber sido ocasionado por la persona que fabrica o vende el bien. Notamos, también, que el denominador común de los casos discutidos es que todos ellos versaban sobre productos defectuosos que fueron introducidos al mercado y provocaron daños.

D. <u>**Responsabilidad por productos defectuosos en España**</u>

En España se reconoce la responsabilidad por productos defectuosos como una doctrina que va a la par con los más modernos enfoques del Derecho en su evolución hacia el principio de la responsabilidad sin culpa.[98] Hace más de dos décadas se promulgó la Ley 22/94, de 6 de julio, la cual definió el término producto como "todo bien mueble, aun cuando se encuentre unido o incorporado a otro bien mueble o inmueble, **excepto las materias primas agrarias y ganaderas y los productos de la caza y de la pesca que no**

---

[98] C. J. Irizarry Yunqué, <u>op. cit.</u>, pág. 463.

**hayan sufrido transformación inicial".**[99] Fíjese que se excluyó del ámbito de responsabilidad civil extracontractual los productos que provienen del mar, ríos u otras aguas y aquellos productos que se obtienen de la caza, salvo que estos fueran sometidos a un proceso de transformación.[100] En cuanto a este punto, el autor Domingo Jiménez Liébana expone que dicha exclusión se basó

en razones técnicas, bien relacionadas con la naturaleza del proceso productivo o ligadas a fases ulteriores. Para las primeras, centrándose más en el momento productivo y la naturaleza de dicha actividad— aparte de reflejar la inadecuación de conceptos—, el motivo de la exclusión del productor agrícola de la disciplina de la responsabilidad objetiva, y de someterse al régimen común, sería la circunstancia de que este último **tiene sobre la actividad productiva una limitada posibilidad de control como consecuencia de la naturaleza «agrícola» de su actividad. De ahí que se opine que sólo cuando, por lo menos, ha tenido lugar una actividad humana cuyos efectos hayan influidos en modo determinante sobre el producto mismo, tal de transformar el producto natural, se someta al régimen de responsabilidad de la Directiva.**

Así, se subraya que los productos agrícolas o naturales se hallan particularmente expuestos a los «defectos ocultos» causados por factores ambientales fuera del control del productor (riesgo que se acentúa, como señala Costato, en los productos de la pesca y los de la caza, por su carácter de animales en libertad), a diferencia del fabricante que controla su actividad productiva.[101]

---

[99] Art. 2 de la Ley 22/94. (Énfasis suplido).
[100] D. Jiménez Liébana, <u>Responsabilidad civil: daños causados por productos defectuosos</u>, Madrid, Ed. McGRAW-Hill/Interamericana de España, S. A. U., 1998, pág. 178.
[101] Íd., págs. 183-184.

Aunque esa fue la norma que imperó durante varios años, posteriormente se aprobó la Ley 14/2000, de 29 de diciembre, la cual

> eliminó el inciso que exceptuaba de la condición de «producto» a las materias primas agrarias y ganaderas y los productos de la caza y de la pesca que no hubiesen sufrido transformación inicial, **pasando así a incluirse dentro de dicho concepto todos los productos agrícolas y asimilados que, con independencia de su estado natural y de haber sido o no sometidos a un proceso de manipulación industrial,** se hubiesen puesto en circulación a partir del 1 de enero de 2001.[102]

Al presente, la disposición legal sobre productos defectuosos que se encuentra vigente es la Ley 1/2007, de 16 de noviembre. Este cuerpo legal define el "producto" como "cualquier bien mueble, aún cuando esté unido o incorporado a otro bien mueble o inmueble, así como el gas y la electricidad".[103] Por lo tanto, actualmente, en España "son susceptibles de subsumirse en tal definición legal todo tipo de bienes muebles, cualquiera que sea su «naturaleza», afinidad, destino o utilización".[104]

Tras un exhaustivo estudio sobre el tema, vemos como varias jurisdicciones permiten instar una acción de responsabilidad estricta por productos defectuosos aunque el demandado no haya creado el producto, ni sea responsable del defecto que el producto tenga.

---

[102] P. Gutiérrez Santiago, Daños Causados por Productos Defectuosos, España, Editorial Aranzadi, 2008, págs. 66-67.
[103] Art. 136 de la *Ley general para la defensa de los consumidores y usuarios y otras leyes complementarias* (real decreto legislativo 1/2007, de 16 de noviembre.
[104] P. Gutiérrez Santiago, op. cit., págs. 67-68.

Esbozado ya el marco legal pertinente, procedemos a resolver.

## IV

## A.

El Tribunal de Distrito nos certificó dos interrogantes. En su pregunta inicial nos invitó a ponderar si, a la luz de la doctrina de productos defectuosos, el suplidor o vendedor de un camarón puede ser responsable por los daños que su consumo produjo por este contener una sustancia tóxica. En términos simples, la interrogante se reduce a determinar si un bien alimenticio que no fue creado propiamente puede estar sujeto a la normativa de productos defectuosos; y si se puede imponer responsabilidad civil extracontractual, a pesar de que el defecto que tiene ese bien no surgió como resultado de un proceso de fabricación.

En lo atinente al primer elemento, en los casos de responsabilidad estricta por productos defectuosos, el asunto inicial que los tribunales debemos de observar es que la controversia gire sobre un producto. En la responsabilidad estricta, para que un objeto sea considerado como un producto, no es necesario que éste sea fabricado o manufacturado. Esta conclusión se apoya en el hecho de que la doctrina de productos defectuosos es un supuesto de responsabilidad sin culpa. Por tal razón, un

demandado responde objetivamente por los daños que perpetúan los productos que introdujo al comercio si estos adolecen de algún defecto. Este tipo de responsabilidad lo que hace es imponer el deber de resarcir sobre una persona que, al ejercer cierta actividad o servicio que representa un riesgo para la comunidad, causa daño a otra. Ello, principalmente, cuando se realiza una actividad que genera un provecho económico y permite calcular y asegurar el riesgo que conlleva. De modo que, **la base que da lugar a la imposición de la responsabilidad estricta por productos defectuosos no necesariamente surge por la creación del producto, sino que también emana de la actividad de introducir al mercado un producto que crea un riesgo, aunque se trate de una actividad lícita.**

Si bien reconocemos que los casos sobre productos defectuosos que hasta hoy hemos atendido versaron sobre productos que fueron creados por intervención humana, ello no significa que los bienes alimenticios que surgen sin que medie acción de las personas y que son introducidos al comercio no puedan considerarse como productos defectuosos. De hecho, así se ha determinado en diversos estados de la Unión Americana, mientras que en España así se erigió por disposición de ley. Obsérvese que los casos que discutimos anteriormente trataban de productos alimenticios que no fueron propiamente creados y en ninguno de ellos se eximió de responsabilidad civil bajo ese pretexto, y aunque lo

atenderemos más adelante, tampoco se relevó de responsabilidad bajo el supuesto de que los productos tenían un defecto que no fue causado por un proceso de fabricación o manufactura.

La confusión sobre este tema surgió pues, anteriormente, afirmamos que el fabricante ──y toda la cadena de distribución── de un producto responden por los daños que estos provoquen por contener un defecto. Empero, de nuestros pronunciamientos se desprende claramente que nunca hemos limitado la aplicación de la responsabilidad estricta a los fabricantes. Tampoco hemos puntualizado quién es un fabricante para fines de esta doctrina. Al respecto, al igual que otros estados, el término fabricante no debe estar limitado al que crea, diseña o produce un bien mueble, sino que también debe comprender quien lo **procesa**, lo **ensambla**, lo **empaca** y lo **etiqueta**, ya que el que realiza cualquiera de estos actos y **posteriormente lo pone en venta** está obligado a garantizar al comprador que ese producto se encuentra libre de defectos. Después de todo, al poner en circulación dicho bien, crea un riesgo en miras de obtener un beneficio económico y, a la luz de las doctrinas de responsabilidad objetiva y responsabilidad estricta por productos defectuosos, debe responder de los daños y perjuicios que provoquen esos productos que procesó, ensambló, empacó o etiquetó y posteriormente vendió.

En cuanto al defecto, éste no necesariamente tiene que ser causado por un proceso de fabricación o manufactura. Como expusimos, para la responsabilidad estricta es indistinto si el demandado actuó culposa o negligentemente pues estaría sujeto de responsabilidad, incluso, al llevar a cabo un acto que no es antijurídico. Lo contrario, es decir, requerir que el demandado provoque el defecto equivaldría a exigir que éste haya actuado de forma culposa o negligente, lo que, a su vez, conllevaría sacar esta normativa del marco de responsabilidad estricta y alejarnos de la normativa vigente en Puerto Rico sobre productos defectuosos. Lo ineludible es que el defecto consista en uno de los tres supuestos que hemos reconocido y definido, a saber: defecto en la fabricación, en el diseño y el defecto por insuficiencia o falta de advertencias o instrucciones.

Pese a lo anterior, al contestar este cuestionamiento, una mayoría de este Tribunal concluyó que la doctrina de responsabilidad estricta no era de aplicación porque el defecto que tenía el camarón no fue resultado de un proceso de fabricación. Para arribar a esa conclusión, la opinión mayoritaria se basó, solamente, en un voto concurrente emitido por el entonces Juez Asociado señor Negrón García en Méndez Corrada v. Ladi's Place, 127 DPR 568 (1990). En dicho voto, se expresó que el fin de esta doctrina era proteger al consumidor contra el descuido del manufacturero

y que la intoxicación por ciguatera no resultó de un proceso de fabricación o manufactura. Sin lugar a dudas, uno de los fines por los que esta normativa se formuló era para proveerle mayor protección a los consumidores. No obstante, ello no puede, ni debe, entenderse como que para poder incoar una acción de responsabilidad estricta por productos defectuosos es necesario un grado de descuido por parte del demandado. Esto ya que, según discutimos, para imponer responsabilidad no se toma en consideración el grado de diligencia que el demandado emplee pues esta responsabilidad no está basada en la culpa o negligencia.

Incluso, exigir que un producto sea fabricado o manufacturado, o que el defecto surja a causa de este proceso, contraviene los precedentes que imponen responsabilidad extracontractual a toda la cadena de distribución, independientemente estos hayan intervenido en el proceso de fabricación y meramente se hayan limitado a la venta del producto. En otros términos, limitar la doctrina de productos defectuosos a aquellos productos fabricados o manufacturados no sería sostenible pues solo podríamos imponer responsabilidad al que está involucrado en el proceso de fabricación y no a toda la cadena que interviene hasta el momento de su venta, como lo hemos hecho en el pasado. **Por ello, para que un demandado sea responsable por los daños y perjuicios que ocasione un producto defectuoso, no es necesario que cree el producto,**

**ni tampoco se requiere que cause el defecto.**[105] **En tal caso, lo que es ineludible es que, entre otras cosas, el demandado haya vendido o distribuido un producto que poseía una condición defectuosa.**[106] Por ende, el vendedor o distribuidor de un producto defectuoso podría estar sujeto a responsabilidad, incluso, aunque no haya tenido la oportunidad de conocer que el producto tenía un defecto, ni el defecto haber sido consecuencia de sus actos u omisiones.[107]

En miras de esta discusión, en el primer planteamiento debimos contestar que la doctrina de productos defectuosos no requiere que el producto sea fabricado o manufacturado. Por tanto, se podría imponer responsabilidad aunque el producto o el defecto no surjan de un proceso de fabricación. Lo importante es que, con el objetivo de obtener un beneficio económico, se introduzca un **producto** al mercado y que ese producto contenga un **defecto** de fabricación, diseño o insuficiente en las advertencias o instrucciones. Lo acertado era disponer que para imponer este tipo de responsabilidad, lo imprescindible no es que el defecto surgió de un proceso de fabricación o manufactura, ya que el defecto puede consistir en que no se proveyó advertencias o instrucciones o que las dadas resultaron insuficientes.

**B.**

---

[105] M. A. Kotler, op. cit., pág. 131.
[106] Íd.
[107] Íd.

El segundo cuestionamiento va dirigido a precisar si, para imponer responsabilidad civil extracontractual por productos defectuosos, hace diferencia el hecho de que el producto tenga un "defecto" que puede descubrirse fácilmente por algún medio.[108] La contestación es que no. Lo imprescindible no es que el defecto sea de fácil detención científicamente o de algún otro modo. Como hemos mencionado, lo indispensable para imponer responsabilidad son los requisitos discutidos anteriormente para los casos de productos defectuosos.

Ahora bien, destacamos que de la Certificación se desprende que existe controversia en cuanto a la aplicabilidad a este caso de lo mencionado en el voto concurrente del entonces Juez Asociado señor Negrón García en Méndez Corrada v. Ladi's Place, *supra*. Para precisar su relación con las preguntas planteadas por el foro federal procedemos a transcribir, *ad verbatim*, el referido voto concurrente:

> *Primero*, se estableció que la intoxicación por ciguatera es un problema mundial grave, en particular en zonas tropicales. Su envenenamiento se distingue de aquel caso causado por bacterias, las cuales surgen por el consumo de pescado dañado por prácticas inadecuadas de manejo y procesamiento. Las investigaciones científicas indican que la ciguatera es causada por unos

---

[108] Hacemos alusión al "defecto" del producto pues así se preguntó. No obstante, reconocemos que, a los efectos de la doctrina productos defectuosos, para que un bien se considere como un "producto defectuoso" es menester que tenga uno de los tres defectos que anteriormente hemos reconocido.

pequeños organismos (dinoflagelados)- mayormente en regiones tropicales- que 'son consumidos por peces pequeños y la toxica es acumulada, a través de la cadena alimenticia, hasta llegar a los peses de mayor tamaño que son consumidos por los humanos'.

*Segundo*, **la toxina no se destruye por métodos convencionales de cocina, a saber: freír, hornear, hervir, etc. Tampoco puede ser eliminada por los métodos convencionales de manejo y procesamiento del pescado tales como secar, salar, ahumar o congelar.**

*Tercero*, la toxina no es detectable por el olor o apariencia del pez. Al presente no hay un método adecuado para descubrirla. Sólo ha podido aislarse por métodos químicos complejos. '[E]l origen e identidad de la o las toxinas envueltas, los organismos que la generan y transmiten así como los factores ecológicos responsables de su causa, no son completamente conocidos o entendidos'.

*Cuarto*, existen más de cuatrocientas (400) especies de peces susceptibles a esta clase de envenenamiento. Los brotes de envenenamiento son esporádicos e impredecibles en época y distribución geográfica. 'No todos los peces de la misma especie que se capturan en el mismo sitio al mismo tiempo son tóxicos. El pez en sí no es afectado por la toxina'.

*Quinto*, el tratamiento médico es sintomático. No hay un antídoto conocido.

*Sexto*, **no existe método disponible para detectar un pez ciguatóxico al ser capturado, como tampoco antes ni después de ser distribuido en el comercio. Se descubre con el consumo humano.**

Estas realidades apoyan una sola conclusión: **no hay forma de prevenir el daño que puede sufrir un consumidor.**

Conscientes del potencial peligro que representara par[a] el consumidor la ingestión de varias especies de pescado, el Departamento de Recursos Naturales, al amparo de la Ley Núm. 82 del 7 de julio de 1979, [12 L.P.R.A. sec. 1351 *et seq.*,] publicó unos carteles, para se[r] exhibidos en los restaurants, donde advierte al público del potencial peligro El Restaurante demandado exhibía uno de éstos… El pescado conocido como 'mero' que es el que se sirve en ruedas en el restaurante del demandado y el cual causó el envenenamiento, no

está entre las especies prohibidas por el Departamento de Recursos Naturales'.

II

La doctrina de responsabilidad absoluta por productos alimenticios expuesta en Castro v. Payco, Inc., 75 D.P.R. 6 (1953), y en Mendoza v. Cervecería Corona, Inc., 97 D.P.R. 499 (1969), no gobierna la situación de autos. Esa responsabilidad persigue proteger el consumidor contra el descuido del manufacturero.

La intoxicación por ciguatera no es el resultado de un proceso de fabricación o manufactura. Tampoco es el producto de ingredientes o técnica de cocina. Es causada por una o varias toxinas acumuladas en el músculo del pescado. Al decir el ilustrado foro de instancia, la 'mano y la voluntad del hombre no intervienen en forma alguna en este proceso natural'.

**En resumen, estamos ante un evento fortuito que no genera responsabilidad.** Jiménez v. Pelegrina Espinet, 112 D.P.R. 700 (1982) La única forma de prevenir el daño es la abstención total.[109]

Fíjese que, bajo esos hechos particulares, el Juez Asociado expresó que la sustancia tóxica no podía ser detectada previo al consumo del pescado, **ni se podía eliminar**. Es a raíz de ello que concluyó que la situación estaba comprendida en una excepción a la responsabilidad civil extracontractual. Esto, en vista de que la responsabilidad estricta admite ciertas defensas y que nuestro Código Civil establece que, "[n]adie responderá de aquellos sucesos que no hubieran podido preverse, o que previstos, fueran inevitables".[110]

---

[109] Méndez Corrada v. Ladi's Place, *supra*, págs. 569-571. (Énfasis suplido).

[110] Art. 1058 del Código Civil de Puerto Rico, 31 LPRA sec. 3022. Es importante destacar que, por ejemplo, en el contexto de los fenómenos naturales, hemos reconocido que el caso fortuito o la fuerza mayor no siempre eximen de responsabilidad civil extracontractual ya que para ello es menester considerar las circunstancias de cada caso. Rivera v. Caribbean Home Const., Corp., 100 DPR 106, 118-119 (1971).

Sobre este particular, los peticionarios puntualizaron que esta controversia se puede distinguir de lo que sucedió en Méndez Corrada v. Ladi's Place, *supra*. Estos, sustentándose en un informe pericial, aseveraron que **la toxina que contenía el camarón era detectable** mediante la realización de ciertas pruebas. También, plantearon que **el camarón se podía limpiar o se le podía remover la vísera o intestino para así eliminar la sustancia tóxica** que contenía. Obsérvese que de ser tales argumentos ciertos, ello significa que los hechos de este caso se pueden distinguir de lo expresado en Méndez Corrada v. Ladi's Place, *supra*. Por lo tanto, a la luz de lo planteado por los peticionarios, si el Tribunal de Distrito decide que la toxina se podía eliminar y que se trataba de un suceso previsible y evitable, entonces, no sería de aplicación lo expresado por el entonces Juez Asociado señor Negrón García en su voto concurrente en en Méndez Corrada v. Ladi's Place, *supra*.

### V

En vista de lo que precede, este Tribunal debió resolver que la doctrina de productos defectuosos no se limita a productos que sean consecuencia de un proceso de manufactura o fabricación. Lo que requiere, *en esencia*, es que se trate de un producto y que este a su vez tenga un

defecto. Es decir, se trate de un producto defectuoso ya sea en la fabricación, el diseño o en la suficiencia de advertencias o instrucciones. Solo en los primeros dos supuestos, el defecto debe surgir de un proceso de fabricación o manufactura del producto.

Una vez se satisfagan estos elementos, el demandante tiene que acreditar que el defecto existía cuando el producto salió del control del demandado y que este se encontraba en el negocio de vender ese producto. Además, debe probar que el defecto es la causa adecuada de los daños que sufrió el demandante. El demandante, también, tiene que evidenciar que utilizó el producto de forma razonable y previsible. En ese sentido, estando estas circunstancias presentes, si el Tribunal de Distrito, al evaluar la prueba le da credibilidad a la evidencia que presentó la parte demandante y la parte demandada no probó la aplicabilidad de alguna defensa, corresponde imponer responsabilidad al demandado al amparo de la doctrina de productos defectuosos.

Por todo lo anterior, en vista de que la mayoría llegó a una conclusión incorrecta, disiento con mucho respeto.


Edgardo Rivera García
Juez Asociado